**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

GREGORY RANDOLPH, *et al.*,     *

     **Plaintiffs,**     *

v.     *

                    **Civil Case No.: PWG-13-1696**

POWERCOMM CONSTRUCTION,     *
   INC., *et al.*

                      *

     **Defendants.**     *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiffs bring this collective action under the Fair Labor Standards Act ("FLSA") and the Maryland Wage and Hour Law ("MWHL"), alleging that they worked in excess of forty hours per week as traffic controllers for Defendant PowerComm Construction, Inc. ("PowerComm") but were not paid sufficient overtime wages. Defendants have moved for summary judgment, arguing that Plaintiffs were independent contractors and not employees covered by the FLSA and MWHL. Plaintiffs respond that, even though they were classified as independent contractors by PowerComm, they actually qualify under the federal and state statutes as employees. Plaintiffs also seek permission to provide notice to other potential plaintiffs. Because a reasonable jury could find that Plaintiffs are employees under the FLSA and MWHL, I deny Defendants' motion for summary judgment and grant Plaintiffs' motion to provide notice.

## I.  FACTUAL BACKGROUND

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). Unless otherwise stated, this background is composed of undisputed facts. Where a dispute exists, I consider the facts in the light most favorable to Plaintiffs. *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391–92; *Dean*, 336 F. Supp. 2d at 480.

Defendant PowerComm is an electrical utility construction company that "'specializes in construction, upgrading, and maintenance of overhead and underground distribution systems.'" First Kwasnik Decl. ¶ 3–4, Mem. of Points & Authorities in Support of Defs.' Mot. for Summ. J. as to Pl.'s Individual Claims ("Defs.' Randolph Summ. J. Mem.") Ex. 1, ECF No. 21. Defendant David Kwasnik, Sr. has been President and CEO of PowerComm since 2010. *Id.* ¶ 2.

Plaintiffs Gregory Randolph and Dana Brown both have worked as "flaggers," or traffic controllers, for PowerComm. *See* Randolph Decl. ¶ 1, Pl.'s Opp'n to Defs.' Mot. for Summ. J. as to Pl.'s Individual Claims ("Randolph Summ. J. Opp'n") Ex. 1, ECF No. 24; Brown Decl. ¶ 1, Pls.' Opp'n to Defs.' Mot. for Summ. J. as to Pl. Dana Brown ("Brown Summ. J. Opp'n") Ex. 1, ECF No. 37. As a flagger, Randolph and Brown each "directed traffic through PowerComm construction sites or other temporary traffic control zones past an area using signs or flags. [They were] responsible for maintaining the safety and efficiency of traffic, as well as the safety of road workers, while allowing construction, accident recovery or other tasks to proceed." Randolph Decl. ¶ 2; Brown Decl. ¶ 2.

PowerComm has provided traffic control services to Pepco since 2002, *id.* ¶ 3, but otherwise does not perform traffic services, and most of its work does not require traffic control. First Kwasnik Decl. ¶ 6. Kwasnik asserts that PowerComm "has used independent contractors to provide traffic control services to Pepco" and that "[s]ome of PowerComm's traffic controllers schedule their work directly with Pepco's other contractors and not with PowerComm." *Id.* ¶ 13.

While working for PowerComm, both Randolph and Brown became certified as flaggers by the American Traffic Safety Services Association, Randolph Decl. ¶ 4; Brown Decl. ¶ 4, which was a necessary prerequisite to work as a flagger, First Kwasnik Decl. ¶ 9. Randolph was trained for this qualification by Milton Roosevelt, whom he describes as a PowerComm supervisor, Randolph Decl. ¶ 4, but whom Kwasnik characterizes as "an independent contractor pursuant to having signed IRS form W-9," Second Kwasnik Decl. ¶ 7, Defs.' Reply in Further Support of Defs.' Mot. for Summ. J. as to Pls.' Individual Claims ( "Defs.' Reply/Randolph") Ex. 18, ECF No. 33, and who worked for another company, First Kwasnik Decl. ¶ 23.[1] Brown was trained on the job by Randolph. Brown Decl. ¶ 4.

Plaintiffs were required to provide their own "personal protective equipment," which included boots, reflective clothing, hard hats, and eye and ear protection, First Kwasnik Decl. ¶¶ 8, 10, but PowerComm supplied flagging equipment and transportation to job sites, Randolph Decl. ¶ 9; Brown Decl. ¶ 9. "Some of PowerComm's traffic controllers work only part time." First Kwasnik Decl. ¶ 16.

---

[1] Kwasnik states that Roosevelt's proper name is Eunise C.R. Melton, and his W-9 is attached to the Second Kwasnik Declaration, ¶ 7. However, the W-9 does not indicate who Melton's employer was or by whom he was being paid. *See* Melton W-9, Second Kwasnik Decl. Ex., ECF No. 33. At the very least, Kwasnik does not appear to dispute that Melton was acting at the behest of PowerComm when he trained Randolph, and both PowerComm and Randolph agree that the course Randolph attended was offered by another company. First Kwasnik Decl. ¶ 23; Randolph Decl. ¶ 4.

The parties disagree as to whether Plaintiffs worked for PowerComm. Plaintiffs both allege that they did. Randolph Decl. ¶ 1; Brown Decl. ¶ 1. Defendants allege that "PowerComm did not use its own traffic controllers, (including Gregory Randolph or Dana Brown)." Second Kwasnik Decl. ¶ 4. However, there is no dispute that both Randolph and Brown were paid by PowerComm for their work in a job that Defendants repeatedly have described as a "PowerComm traffic controller." *See* Kwasnik, Jr. Decl. ¶¶ 3–15.

### A. Gregory Randolph

Gregory Randolph alleges that he was required to call his crew foreman, Chester Brown, every morning to find out if there was work for him that day, and that he was required to work whenever Brown had work for him. Randolph Decl. ¶¶ 7–8. When there was work, Randolph would report to a Pepco yard, record his start time, and then drive to the worksite in a van provided by PowerComm. *Id.* ¶¶ 10–11. At the end of the day, Randolph would drive the van back to the Pepco yard and record his end time. *Id.* ¶ 12. Randolph often worked twelve-hour days, at a wage of $12.00 per hour irrespective of how many hours he worked. *Id.* ¶ 13. Randolph has attached to his Declaration several pay stubs, all of which indicate that he was paid for his work by PowerComm. *See id.* ¶ 14. Randolph's income typically was reflected on a 1099 form from PowerComm, but sometimes was recorded on a W-2 form. *Id.*

At some point, Randolph came to believe that he was entitled to time-and-a-half for work in excess of forty hours a week, and spoke to Kwasnik's son, Dave Kwasnik, Jr. ("Kwasnik, Jr."). *Id.* ¶ 16–17. Kwasnik, Jr. stated that he did not have any documentation for Randolph but otherwise would be willing to pay him overtime; Randolph was fired a few days later. *Id.* ¶¶ 19–

20.[2]   Randolph avers that he did not receive overtime pay from June 12, 2010 through approximately March 2013, during which time he worked an average of fifty-five hours per week at a wage of $10.00 to $12.00 per hour, totaling approximately $11,797.50 in unpaid overtime. *Id.* ¶ 23.

Defendants dispute several of Randolph's facts, and have introduced declarations stating that Chester Brown was the foreman for another contractor, Utility Lines, Inc., and that PowerComm did not determine Randolph's work schedule or duties or sign off on his time sheets. First Kwasnik Decl. ¶¶ 19–21; Second Kwasnik Decl. ¶¶ 8–9; Salihu Decl. ¶¶ 7–11, Defs.' Randolph Summ. J. Mem. Ex. 10, ECF No. 21; Puryear Decl. ¶¶ 6–10, Defs.' Randolph Summ. J. Mem. Ex. 11, ECF No. 21. Further, Kwasnik states that PowerComm never signs off on its traffic controllers' timesheets because those controllers are supervised by Pepco or other contractors, and not by PowerComm directly. *Id.* ¶ 21. At one point, Randolph refused to provide PowerComm with information "related to his parole officer because he was, in his own words, 'an independent contractor.'" *Id.* ¶ 24. Finally, Kwasnik asserts that "Randolph never worked on any PowerComm construction site." *Id.* ¶ 10.

The documents introduced by Defendants show that Randolph did work in excess of forty hours per week on multiple occasions, Randolph Employee Information Report, Defs.' Randolph Summ. J. Mem. Ex. 6, ECF No. 21 (listing several pay periods in which Randolph recorded in excess of eighty hours), and Defendants admit that he was not paid for that time until at least March 2013, Defs.' Randolph Summ. J. Mem. 7. Defendants assert that, in Randolph's final pay

---

[2] Defendants dispute that Randolph was fired because of his request for overtime pay. First Kwasnik Decl. ¶ 27. Because Plaintiffs do not appear to have pleaded an FLSA retaliation claim, *see* Compl.; *see also* 29 U.S.C. § 215(a)(3), the circumstances surrounding Randolph's termination are not material.

period, his hours were adjusted upwards from seventy to 107 in order to compensate for his unpaid overtime prior to that date.  Kwasnik Decl. ¶¶ 10–15.

### B.  Dana Brown

Dana Brown was employed as a flagger from June 2011 through December 2012.  Brown Decl. ¶ 1.  Sometimes she was paid as a W-2 employee, and at other times her income was reflected on 1099 forms.  *Id.* ¶ 13.  Brown avers that she worked overtime often, and typically worked twelve-hour days and in excess of forty hours in a week.  *Id.* ¶ 13.  Although she received overtime on one occasion when she was asked to work "on an emergency job," Kwasnik, Jr. told her "that PowerComm doesn't pay overtime."  *Id.* ¶ 14.  Brown claims that she worked an average of forty-four to forty-nine hours per week at a final wage of $9.50 per hour, and that she was not paid overtime wages for her work in excess of forty hours per week.  *Id.* ¶ 15.

In contrast to their position with respect to Randolph, Defendants do not dispute that Brown did work for PowerComm.  Kwasnik explains, "PowerComm paid [Brown] one $456.00 payment in 2012 as a W-2 for a two-week pay period, because PowerComm initially believed it was required to do so under Obamacare.  However, this issue remains unresolved, and Brown thereafter demanded that she be paid as a 1099."  Third Kwasnik Decl. ¶ 3, Mem. of Points and Authorities in Support of Defs.' Mot. for Summ. J. as to Pl. Dana Brown's Individual Claims ("Defs.' Brown Summ. J. Mem.") Ex. 9, ECF No. 35.  Kwasnik states that Brown's employment ended on December 10, 2012, when she stoped showing up for work.  *Id.* ¶ 4.

### C.  Procedural History

On June 12, 2013, Plaintiff Randolph filed his two-count collective and class action complaint in this Court, alleging (i) class claims under the Maryland Wage and Hour Law

("MWHL"), Md. Code Ann., Lab. & Empl. § 3-401 *et seq.* and (ii) representative claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Compl. 9–10, ECF No. 1. Defendants answered on June 25, 2013, Ans., ECF No. 3.

On July 26, 2013, Defendants filed a Motion for Order Prohibiting Plaintiff and his Representatives from Contacting Defendants' Current and Former Employees Telephonically, by E-mail and/or in Person, ECF No. 17, and accompanying Memorandum, ECF No. 18, alleging misconduct by Plaintiff's counsel. Finding that the Maryland Lawyers' Rules of Professional Conduct were adequate to regulate the conduct of counsel, I denied the motion in a Letter Order dated September 3, 2013, ECF No. 29.

On August 14, 2013, Defendants moved for summary judgment, Defs.' Mot. for Summ. J. as to Pl.'s Individual Claims ("Defs. Randolph Summ. J. Mot."), ECF No. 20. Randolph filed his Opposition on August 28, 2013, Randolph Summ. J. Opp'n, ECF No. 24. Defendants sought to stay discovery pending adjudication of their summary judgment motion, Defs.' Mot. to Stay, ECF No. 25, which I denied by Letter Order dated September 9, 2013, ECF No. 30, noting that Defendants had not sought to dismiss this case or to modify the Scheduling Order, and that the filing of a summary judgment motion, if anything, increased the urgency to develop facts on which the Court could rule. Defendants replied on October 25, 2013, Defs.' Reply/Randolph, ECF No. 38.

On August 27, 2013, Randolph filed Brown's Notice of Consent to Opt In, ECF No. 23, and on September 27, 2013, Defendants filed a summary judgment motion with respect to Brown Defs.' Mot. for Summ. J. as to Pl. Dana Brown's Individual Claims ("Defs.' Brown Summ. J. Mot."), ECF No. 34, along with an accompanying Memorandum ("Defs.' Brown Mem."), ECF No. 35. Brown filed her opposition on October 10, 2013 ("Brown Summ. J. Opp'n"), ECF

37, and Defendants replied on October 25, 2013 ("Defs.' Reply/Brown"), ECF No. 38. Both summary judgment motions now are ripe and are before me.

On November 5, 2013, several months before the close of discovery, Plaintiffs filed a Motion to Allow Notice to Similarly Situated Employees and to Approve Interrogatory to Defendants Seeking the Identity of Similarly Situated Employees ("Pls.' Mot. for Notice"), ECF No. 41, and supporting Memorandum ("Pls.' Notice Mem."), ECF No. 42. Defendants filed their opposition on November 22, 2013 ("Defs.' Notice Opp'n), ECF No. 43, and Plaintiffs replied on December 3, 2013 ("Pls.' Notice Reply"), ECF No. 45. Discovery closed on January 17, 2014 and on February 6, 2014, Defendants filed a prophylactic Motion to Decertify Collective Action or, Alternatively, Motion for Summary Judgment, ECF No. 46, and supporting Memorandum ("Defs.' Decertify Mem."), ECF No. 47. Plaintiffs filed an opposition that same day ("Pls.' Decertify Opp'n"), ECF No. 48, and Defendants replied on February 24, 2014 ("Defs.' Decertify Reply"), ECF No. 49. Those motions also are ripe.

Having reviewed the filings in this case, I find a hearing is unnecessary. Loc. R. 105.6.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts. *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* "[U]nder Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form." *Mallik v. Sebelius*, ---- F. Supp. 2d ----, 2013 WL 4559516, at *12 (D. Md. Aug. 28, 2013) (citing *Niagara Transformer Corp. v. Baldwin Techs., Inc.*, No. DKC-11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013)).

A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin*, 107 F. Supp. 2d at 671. The substantive law governing the case determines what is material. *See Hoovan-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see* Fed. R. Evid. 401 (defining relevance).

## III. DISCUSSION

### A. Defendants' Evidentiary Objections

Defendants' Randolph Reply and Defendants' Brown Reply both seek summary judgment on the technical grounds that Plaintiffs have not adequately shown factual disputes sufficient to defeat summary judgment. This simply is incorrect.

First, Defendants argue that Plaintiffs have "failed to properly address the facts proffered by defendants as required by Rule 56(c)." Defs.' Reply/Randolph 2; Defs.' Reply/Brown 2. Defendants further argue that Plaintiffs have not "indicate[d] which material, supported facts

proffered by the defendants are supposedly in dispute." Defs.' Reply/Randolph 2; Defs.' Reply/Brown 2. But Randolph and Brown have provided declarations, based on personal knowledge, disputing many of Defendants' factual assertions. *See* Randolph Decl.; Brown Decl. For example, Plaintiffs have provided evidence that they were employed and paid by PowerComm, Randolph Decl. ¶¶ 13–15; Brown Decl. ¶ 14, that contradicts Defendants' evidence that PowerComm did not employ its traffic controllers, *see, e.g.*, First Kwasnik Decl. ¶ 4.[3] If Defendants' objection is on the ground that Plaintiffs have not provided a clearly marked document denoted "Statement of Disputed Facts," Defendants elevate form over substance. Though a clear list of relevant facts often may be helpful to the Court, Fed. R. Civ. P. 56(c) requires no more than for a party to support its factual contentions by citation to competent evidence.

Defendants also object that Plaintiffs "rel[y] upon inadmissible hearsay and conclusory statements, unsupported by any evidence." Brown Reply Mem. 2; *see also* Randolph Reply Mem. 2. This too, simply is wrong. Randolph and Brown both have provided sworn declarations, pursuant to Fed. R. Civ. P. 56(c)(4). The sworn statements contained in Plaintiffs' declarations themselves are evidence that may be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (an issue of fact must be supported by "citing to particular parts of materials in the record, including . . . affidavits or declarations"); *Woollard v. Gallagher*, 712 F.3d 865, 877 & n.6 (4th Cir. 2013) (relying on declarations as evidence on summary judgment). To the

---

[3] Of course, even had Plaintiffs failed to show evidence of this particular fact, the Defendants themselves have produced sufficient evidence to dispute their own assertions and to allow a fact-finder to conclude that Randolph and Brown were employed directly by PowerComm. *See, e.g.*, Kwasnik, Jr. Decl. ¶¶ 3–15 (describing how Randolph was paid by PowerComm); Randolph 1099 Forms, Defs.' Randolph Summ. J. Mem. Ex. 6, ECF No. 21 (listing wages paid to Randolph by PowerComm); Randolph Employee Information Report, Defs.' Randolph Summ. J. Mem. Ex. 6, ECF No. 21 (describing Randolph as an "employee" paid by PowerComm).

extent that Defendants argue that Plaintiffs have failed to provide documentary evidence of their entitlement to overtime pay, that goes to the weight of the evidence at trial, not its sufficiency to prevent summary judgment.

Finally, Defendants argue that the documents they have introduced contradict Plaintiffs' declarations, *see* Randolph Reply 4; Brown Reply 3, or that, in Defendants' view, certain statements made by Plaintiffs are "patently false," Brown Reply 3. This is precisely the type of factual dispute that makes summary judgment inappropriate. For example, Plaintiffs have provided declarations from personal knowledge regarding the hours that they actually worked. Randolph Decl. ¶ 23; Brown Decl. ¶ 15. In response, Defendants have shown evidence to support its own contentions regarding Plaintiffs' hours. *See* Randolph Employee Information Report. The appropriate time to resolve this dispute—and to determine whether the hours recorded accurately reflect hours actually worked—is at trial, not at summary judgment.[4]

### B. Plaintiffs' Employment Status

Defendants seek summary judgment on the grounds that Plaintiff was an independent contractor and not an employee. Defs.' Randolph Summ. J. Mem. 11; Defs.' Brown Summ. J. Mem. 5. The FLSA defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and to "'[e]mploy' includes to suffer or permit to work," 29 U.S.C. § 203(g). Though these definitions deliberately are broad, the FLSA recognizes a difference between employees, which it covers, and independent contractors, which it does not. *See Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006). To determine which category a

---

[4] Plaintiff also has objected to Randolph's statements about how he became aware that he had a potential FLSA claim as "inadmissible hearsay." Randolph Reply 4. Because this statement seems to be included to provide Randolph's state of mind when he confronted Defendants, and may be an admission of PowerComm in any event, it is not hearsay. *See* Fed. R. Evid. 801(c) & (d)(2)(A). But it also is not material to any claim or defense, so its admissibility purely is academic.

worker falls into, "a court considers the 'economic realities' of the relationship between the worker and the putative employer," *id.* (citing *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994)), to determine "whether the worker 'is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself," *id.* (alteration in original). To determine the economic reality of the relationship, courts apply a six-factor test that examines:

> 1) the degree of control which the putative employer has over the manner in which the work is performed;
> 2) the opportunities for profit or loss dependent upon the managerial skill of the worker;
> 3) the putative employee's investment in equipment or material;
> 4) the degree of skill required for the work;
> 5) the permanence of the working relationship; and
> 6) whether the service rendered is an integral part of the putative employer's business.

*Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 457 (D. Md. 2000).[5] These factors first were discussed in *United States v. Silk*, 331 U.S. 704, 715 (1947), and therefore often are referred to as the *Silk* factors. "Rather than looking at one particular factor or applying these factors 'mechanically,' courts look at the totality of the circumstances in applying them." *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 671 (D. Md. 2000). "Maryland's Wage and Hour Law defines 'employ' in a similar manner" to the FLSA, and a similar test is applied. *See Heath*, 87 F. Supp. 2d at 457.

---

[5] Defendants focus heavily on the fact that they characterized Plaintiffs as independent contractors and typically classified them as "1099" employees, rather than "W-2" employees. *See generally* Defs.' Randolph Summ. J. Mem.; Defs.' Brown Summ. J. Mem. Defendants have not cited any case law that suggests that the manner in which Plaintiffs were classified for tax purposes is dispositive in determining their status as employees, and I am aware of no such precedent.

### 1. Degree of Control

With respect to the first *Silk* factor, Plaintiffs have shown that PowerComm exercised considerable control over their work. According to Plaintiffs, they were required to contact a supervisor daily to determine if there was work available and, if so, Plaintiffs were told when to report, where to go, and when to leave. Randolph Decl. ¶¶ 6–12; Brown Decl. ¶¶ 6–12. This level of control requires the flaggers to be in a specific place at specific times and touches "every aspect of the [flaggers'] work," *Heath*, 87 F. Supp. 2d at 457, denying them even the minimal freedom that was allowed to cable installers in *Herman*, who had freedom to perform their jobs free of defects and to train and supervise helpers or subcontractors, 164 F. Supp. 2d at 672–74.

Defendants have not meaningfully contested that this factor weighs in favor of Plaintiffs being *somebody's* employee, and they seem to acknowledge that Plaintiffs were told when to work, where to go, and what to do. *See* Salihu Decl. ¶¶ 8–11, 17. Defendants only argue that it was another entity, not PowerComm, who made those decisions, whether it was a subcontractor, *see id.* ¶¶ 9, 16–17, or the State of Maryland, *id.* ¶ 11. Because a reasonable jury could find that Plaintiffs were controlled by Defendants, or by subcontractors to whom Defendants had delegated their control, this factor weighs against summary judgment.

### 2. Opportunity for Profit or Loss

Defendants argue that, because Plaintiffs were hourly employees, they had the ability to increase their pay and to control their own profits or losses. Defs.' Randolph Summ. J. Mem. 13; Defs.' Brown Summ. J. Mem. 7–8. "The ability to generate more money based on skill and hard work denotes independent contractor status." *Cf. Herman*, 164 F. Supp. 2d at 674–75 (citation omitted). But Plaintiffs both claim that their hours were controlled by PowerComm alone (or

PowerComm's subcontractors), and that they were not free to seek out other work.  Randolph Decl. ¶¶ 7–8; Brown Decl. ¶¶ 7–8.  This factor weighs in Plaintiffs' favor.

### 3. Investment in Equipment or Material

Defendants place great weight on the fact that Plaintiffs' "provided [their] own personal protective equipment."  Defs.' Randolph Summ. J. Mem. 14; Defs.' Brown Summ. J. Mem. 8. In *Herman*, cable installers provided their own "truck or van and specialty tools," "contrast[ing] sharply with the experience of a typical clerical employee, who finds all of his office supplies waiting for him at his work station," and weighing in favor of their status as independent contractors.  *Herman*, 164 F. Supp. 2d at 675.  But here, the specialized or expensive equipment required for Plaintiffs' work—the flag or paddle itself and a truck to travel to the worksite—were provided by PowerComm.  *See* Randolph Decl. ¶ 9.  In contrast, the "protective equipment" supplied by Plaintiffs included "reflective clothing, steel toe boots, hard hats, safety vest, eye and ear protection."  Puryear Decl. ¶ 4.  That is to say, much like any clerical employee, Plaintiffs were required to show up to work clothed in a manner appropriate for their work.  This factor favors Plaintiffs.

### 4. Degree of Skill Required

Defendants argue that performing traffic control work is a skilled trade on par with carpentry or electrical work.  Defs.' Randolph Summ. J. Mem. 14; Defs.' Brown Summ. J. Mem. 8–9.  "Traditionally, carpenters, construction workers, electricians and similarly skilled tradesmen are considered independent contractors," *Herman*, 164 F. Supp. 2d at 675, and it appears that not just anyone can show up and work as a flagger; it requires a specific certification.  *See* Kwasnik Decl. ¶ 9; *cf. Butler v. PP & G, Inc.*, No. WMN-13-430, 2013 WL 5964476, at *5 (D. Md. Nov. 7, 2013) ("the lack of a requirement of specialized skills is

'indicative of employee status'" (citation omitted)). But it does not appear that the certification process was lengthy or difficult or that any coursework was required, *see* Brown Decl. ¶ 4 (stating that Brown never took a course and, instead, learned on the job), and Defendants have provided an example of the State of Maryland Flagger Exam, which consists of twenty-five multiple choice questions, many of which likely could be answered correctly with no advance preparation. *See* Flagger Exam, Defs.' Reply/Randolph Ex. 14, ECF No. 33.[6] Thus any certification requirement is minimal, *cf. Viar-Robinson v. Dudley Beauty Salon*, No. PWG-12-1794, 2013 WL 6388646 (D. Md. Dec. 5, 2013) (finding this factor in favor of contractor status where nail technicians had to attend six months of classes and obtain a degree), and Plaintiffs have stated that "the hardest part of the job was standing in traffic all day without getting hit by a car." Randolph Decl. ¶ 9; Brown Decl. ¶ 9. A reasonable jury could rely on this to find that flaggers were not skilled workers, and therefore this factor weights in favor of Plaintiffs.

### 5. Permanence of the Working Relationship

Plaintiffs did not have a specified end date, but they have stated that they were not free to find other work or to come and go as they pleased. *See* Randolph Decl. ¶¶ 7–8; Brown Decl. ¶ 7–8; *see also Butler*, 2013 WL 5964476, at *5 (exotic dancers had no specified end date, "[c]ould come and go as [they] pleased" and were "free to work at other adult entertainment clubs"). Defendants have provided evidence that "PowerComm's traffic controllers have no guarantee of work from PowerComm," First Kwasnik Decl. ¶ 12, that most of their traffic controllers have worked there "less than a year," *id.* ¶ 15, and some of their controllers "work

---

[6] For example, Question two asks, "When working as a flagger, which of the following should you <u>NOT</u> do?" The answer choices are, "Be in control," "Stay alert," "Be visible," or "Listen to AM/FM radio." Flagger Exam. Question three prompts, "The most important reason to be a good flagger is:" and provides the answer choices, "The pay," "The prestige," "Lives depend on you and your actions," and "The cool vest." Flagger Exam. I do note, however, that not all of the questions are equally simple.

only part time," *id.* ¶ 16. On the other hand, both Randolph and Brown worked exclusively for PowerComm for over a year. Randolph Decl. ¶¶ 1, 8; Brown Decl. ¶¶ 1, 8. Although it is by no means clear, a jury could find that the length of this working relationship favors Plaintiffs and, in any event, "this factor . . . 'is entitled to only modest weight in assessing employee status under the FLSA.'" *Butler*, 2013 WL 5964476, at *5 (quoting *Hart v. Rick's Cabaret Int'l, Inc.*, ---- F. Supp. 2d ----, 2013 WL 4822199, at *14 (S.D.N.Y. Sept. 10, 2013)).

### 6. Integral Nature of Services Rendered

Defendant argues that traffic control is not an integral part of PowerComm's business because PowerComm's focus was on electrical work. Defs.' Randolph Summ. J. Mem. 19; Defs.' Brown Summ. J. Mem. 11. But "this factor does not turn on whether the individual worker was integral to the business; rather, it depends on whether the service the worker performed was integral to the business." *Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 582 (D. Md. 2008); *see also Heath*, 87 F. Supp. 2d at 459 ("Although geographically, [chicken catchers'] work takes place outside the [chicken] processing plants, the catchers' function, in a real sense, is simply part of the production line."). Plaintiffs have stated that a flagger is a necessary part of a crew doing electrical work on certain roads. *See, e.g.*, Randolph Decl. ¶ 9. This is not simply an unrelated worker setting up a stand at a location that happens to be PowerComm's worksite. *See Viar-Robinson*, 2013 WL 6388646, at *6 (nail technician who set up a work station at a hair salon was not integral to work of hair salon). A jury could find that this factor weighs in favor of Plaintiffs.

### 7. Plaintiffs Adequately Have Shown that They Were Employees

After reviewing all of the *Silk* factors, it is apparent that a reasonable jury could find that Plaintiffs were employees, and not independent contractors. A jury could find that Plaintiffs did

not set their own hours or have the freedom to increase their profits with additional work, that the only equipment that Plaintiffs were expected to provide was clothing and personal protective gear, and that PowerComm could not have performed its work for Pepco without a flagger on its crew. And a reasonable jury could find that Plaintiffs were unskilled laborers and had a relatively permanent relationship with Defendants. Accordingly, Defendants are not entitled to summary judgment on this basis.

### 8. PowerComm Was an Employer

Defendants also argue that Plaintiffs were not PowerComm's employees, but were working for Chester Brown who "was *not an employee or independent contractor of PowerComm*. Rather, Chester Brown was employed by Utility Lines Construction Services, Inc. while [Randolph and Brown] worked for PowerComm." Defs.' Randolph Summ. J. Mem. 7; Defs.' Brown Summ. J. Mem. 6. In essence, Defendants appear to be arguing that, because PowerComm gave its subcontractors supervisory power over its workers, they have insulated themselves from liability under the FLSA by giving up "the requisite right of control over" these employees. Defs.' Randolph Summ. J. Mem. 7; Defs.' Brown Summ. J. Mem. 6.

This argument is too clever by half. First, it readily is apparent that PowerComm was paying Plaintiffs' wages, *see, e.g.*, Randolph 1099 Forms; Brown 1099 Forms, Defs.' Brown Summ. J. Mem. Ex. 2, ECF No. 35, and therefore is Plaintiffs' employer even if they are not the only such employer. *See Schultz v. Falk*, 439 F.2d 340, 345 (4th Cir. 1971) (finding that rental agencies were employers where, "[w]ithin the limits of generalized and fairly long-term budgets, they set the wages of the . . . workers"). Second, Defendants repeatedly refer to Randolph and Brown as "PowerComm traffic controllers," *see, e.g.*, Kwasnik, Jr. Decl. (repeatedly describing

Randolph as a "PowerComm traffic controller"), which, alone, would allow a reasonable jury to conclude that Plaintiffs were working for PowerComm and not for Utility Lines or anyone else.

### C. Existence of Money Owed to Plaintiffs

Defendants next argue that they are entitled to summary judgment because Plaintiffs have been paid for all of the overtime they have worked. Defs.' Randolph Summ. J. Mem. 18; Defs.' Brown Summ. J. 13. An employee "has the burden of establishing the hours he claims to have worked and the work he claims to have performed for which he was not paid." *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946); *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 748 (D. Md. 2003)). But where, as here, the employer does not have precise records of the employee's hours, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer . . . ." *Anderson*, 328 U.S. at 687.

The FLSA "does not mandate that a plaintiff prove each hour of overtime work with unerring accuracy or certainty." *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 108 (4th Cir. 1988). Here, Plaintiffs have provided estimates of the hours that they worked above and beyond forty hours per week: Randolph has averred that he worked approximately fifty-five hours per week for 143 weeks, Randolph Decl. ¶ 23, and Brown has averred that she worked at least forty-four hours per week from June 2011 through December 2012, Brown Decl. ¶¶ 1, 15.

With respect to Randolph, Defendants argue that eventually he received all of the overtime pay that he now seeks. Defendants have produced a document that they say shows that Randolph recorded thirty-four hours in excess of eighty hours per pay period between May 18,

2012 and March 22, 2013.[7]  *See* Randolph Employee Information Report.  According to Defendants, during the pay period ending March 23, 2013, Randolph worked seventy hours but was recorded as having worked 107 hours, comprising 103 hours of regular time and four hours of overtime, in order to compensate him for the thirty-four hours of overtime pay he was owed. Kwasnik, Jr. Decl. ¶¶ 10–15.

In addition to being extremely difficult to follow, this argument cannot defeat Randolph's case. First, by demonstrating that Randolph's Employee Information Report was manipulated by Defendants to provide Randolph with additional compensation in his final pay period, Defendants cast doubt on the trustworthiness of the report itself, and therefore on its admissibility.  *See, e.g.*, Fed. R. Evid. 803(6)(E) (allowing for hearsay evidence contained in records of a regularly conducted activity to be admitted only if "neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness").  Second, Randolph's claims cover 143 weeks, dating back to June 2010, Randolph Decl. ¶ 23; Defendants do not even contend that they paid Randolph for any time prior to May 2012, Defs.' Randolph Summ. J. Mem. 19.

As for Brown, Defendants argue that "*all* Brown offers are allegations."  Defs.' Brown. Reply 12.  Once again, Defendants seem to misunderstand the significance of a statement of fact made under oath, which is distinct from an allegation that may or may not have factual support. Brown's declaration, sworn in compliance with 28 U.S.C. § 1746, qualifies as substantive evidence on summary judgment.  Fed. R. Civ. P. 56(c)(4).  Brown has averred that she worked an average of forty-four to forty-nine hours per week.  Brown Decl. ¶ 15.  Defendants have

---

[7] Defendants appear to assume that eighty hours per pay period is equivalent to forty hours per week, but this plainly is not so.  For example, an eighty hour pay period may represent thirty hours one week and fifty the next, entitling the employee to ten hours of overtime pay.

responded by providing evidence of how much she was paid, but not of how many hours she worked or how much she was entitled to be paid. *See, e.g.*, 2011 Brown 1099 Form, Defs.' Brown Summ. J. Mem. Ex. 2, ECF No. 35; 2012 Brown 1099 Form, Defs.' Brown Summ. J. Mem. Ex. 3, ECF No. 35; 2012 Brown W-2 Form, Defs.' Brown Summ. J. Mem. Ex. 4, ECF No. 35. The only evidence that Defendants have presented with respect to the hours Brown worked is her Employee Information Report, *see* Brown Employee Information Report, Defs.' Brown Summ. J. Mem. Ex. 7, ECF No. 35, which reflects only a single pay period and, in any event, does not reflect the hours Brown actually worked, *supra*.[8]

This is distinguishable from *McLaughlin v. Murphy*, in which the plaintiff stated at his deposition that he did not recall how many hours he had not been paid for and was not able to provide more than a "'just and reasonable inference' of time worked without proper compensation." *McLaughlin*, 436 F. Supp. 2d at 738. Moreover, the Court in *McLaughlin* did not need to determine conclusively whether McLaughlin had worked the hours alleged because

---

[8] Defendants also rely on unemployment applications filed by Randolph and Brown, for reasons that are not entirely clear. *See* Defs.' Randolph Summ. J. Mem. 19; Defs.' Brown Summ. J. Mem. 14. Randolph filed an unemployment application claim dated March 17, 2013. Randolph Umemployment Application, Defs.' Randolph Summ. J. Mem. Ex. 8, ECF No. 21. Defendants point to the "base period," which is September 30, 2011 to October 1, 2012, *id.*, as evidence that Randolph sought unemployment insurance for time that he was working full time. Defs.' Randolph Summ. J. Mem. 20. This argument fails to comprehend Randolph's application. The "base period" is used to calculate *eligibility* for benefits only. *See* DC Dep't of Emp't Servs., *UI: District of Columbia Unemployment Insurance: Claimant's Rights and Responsibilities* 1 (Rev'd Apr. 2011), *available at* http://does.dc.gov/sites/default/files/dc/sites/does/publication/ attachments/ DOES_UI_Book.pdf. The claim date, March 17, 2014, comports with Randolph's representation that he worked for PowerComm "through March 2013." Randolph Decl. ¶ 1. With respect to Brown, Defendants make the same mistake. *See* Brown Unemployment Application, Defs.' Brown Summ. J. Mem. Ex. 5, ECF No. 35; Defs.' Brown Summ. J. Mem. 14. And although Brown applied for benefits during the time that she was working for PowerComm, that application stated that "work halted for 2 wks due to Hurricane Sandy." Brown Unemployment Application. This is consistent with Brown's statement that she did not work every week, *see* Brown Decl. ¶ 7, and hardly disproves her statements regarding the hours she generally worked for PowerComm, *id.* ¶ 15.

he had admitted that his employer did not know that he was incurring overtime in the first place, *id.*, an issue that has not been raised here. Whether Plaintiffs have been compensated for every hour of overtime worked remains a subject of dispute, and therefore summary judgment is not appropriate.

### D. Plaintiffs' Motion to Allow Notice

Plaintiffs also have filed a Motion to Allow Notice to Similarly Situated Employees and to Approve Interrogatory to Defendants Seeking the Identity of Similarly Situated Employees ("Pls.' Mot. for Notice"), ECF No. 41 and accompanying memorandum ("Pls.' Notice Mem."), ECF No. 42. Plaintiffs assert that "all potential Opt-Ins are similarly situated," and that notice should be allowed in an exercise of this Court's discretion under the FLSA. Pls.' Notice Mem. at 1.

The FLSA provides that an action under the statute:

> may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees *similarly situated.* No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added). Unlike in class actions under Fed. R. Civ. P. 23, in FLSA collective actions, "plaintiffs must affirmatively 'opt in' to the suit in order to be considered a member of the class"; Rule 23's requirements of numerosity, typicality, commonality, and adequacy do not apply; and plaintiffs only need to show that they and potential class members are "similarly situated" for the Court to certify the collective action. *Mancia v. Mayflower Textile Servs. Co.*, No. CCB-08-273, 2008 WL 4735344, at *2 (D. Md. Oct. 14, 2008); *see also Myles v. Prosperity Mortg. Co.*, No. CCB-11-1234, 2012 WL 1963390, at *6 (D. Md. May 31, 2012) (observing that "'numerous courts . . . have refused to apply [*Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S. Ct. 2451 (2011),] on motions for conditional certification under the FLSA, concluding that the Rule 23 analysis had no place at this stage of the litigation" (quoting *Winfield v. Citibank, N.A.*, 843 F. Supp. 2d 397, 409 (S.D.N.Y. 2012) (ellipsis in original)).

Certification is a two-step process:  Prior to discovery, "the court makes a threshold determination of 'whether the plaintiffs have demonstrated that potential class members are "similarly situated,"'"[9] and after discovery closes, "'the court engages in a more stringent inquiry to determine whether the plaintiff class is [in fact] "similarly situated" in accordance with the requirements of § 216, and renders a final decision regarding the propriety of proceeding as a collective action.'"  *Archer v. Freedmont Mortg. Corp.*, No. GLR-12-1099, 2013 WL 93320, at *2 (D. Md. Jan. 7, 2013) (quoting *Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 686 (D. Md. 2010)).  However, court-facilitated notice is not one of the steps.  Rather, it is a means for plaintiffs to contact individuals whom plaintiffs have shown to be "similarly situated."  *See id.*  Nevertheless, although Plaintiffs do not request conditional certification explicitly, I construe Plaintiffs' motion as a motion for conditional certification, as well as a motion to facilitate notice, in accordance with the procedure followed by other judges in this Court.  *See, e.g.*, *McFeeley v. Jackson Street Entmt., LLC*, No. DKC-12-1019, 2012 WL 5928902 (D. Md. Nov. 26, 2012); *see also* Fed. R. Civ. P. 1 (requiring the Court to construe the rules of procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding"); *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 792 n. 1 (D. Md. 2010) (explaining that Rule 1

---

[9] Plaintiffs filed their Motion for Notice several months prior to the close of discovery, and neither party has indicated that new information has been disclosed that affects the merits of Plaintiffs' Motion for Notice.  Accordingly, I must assume that the facts as stated in the Motion for Notice are unchanged.

instructs the Court "not [to] exalt form over substance"); *Hall v. Sullivan*, 229 F.R.D. 501, 504 (D. Md. 2005) (same).[10]

Defendants' primary ground for opposing Plaintiffs' motion is their claim that the purported plaintiffs are not "similarly situated." Defs.' Opp'n to Pls.' Mot. for Notice to Similarly Situated Employees and to Approve the Attached Interrog. Ordering Defendant [*sic*] to Identify All Similarly Situated Employees ("Defs.' Notice Opp'n") 8, ECF No. 43. Whether plaintiffs are "similarly situated" is "left to the sound discretion of the district court," although the Court should "apply the FLSA broadly." *Mancia*, 2008 WL 4735344, at *3. Moreover, at this first step of the certification process, plaintiffs "need only make a 'relatively modest factual showing' that they are 'similarly situated' in order to proceed as a class." *Id.* at *2 (quoting *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995)). Indeed, "with initial collective action certifications under §216(b), 'courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Id.* (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988), *aff'd in part*, 862 F.2d 439, 444 (3d Cir. 1988), *aff'd*, 493 U.S. 165 (1989); *see Faust v. Comcast Cable Commc'ns Mgmt., LLC*, No. WMN-10-2336, 2011 WL 5244421, at *2 (D. Md. 2011) (stating that, for conditional certification, plaintiffs only need to show "'a colorable basis for their claim that a class of "similarly situated" plaintiffs exist[s]'" (citation omitted)). The plaintiffs' allegations must be "more than 'vague allegations' with 'meager factual support,' but [they] need not enable the court to reach a conclusive determination whether

---

[10] Because Defendants already have filed a prophylactic motion to decertify, ECF No. 46, there also is no risk that considering whether this action should be conditionally certified *sua sponte* would deprive Defendants of their right to be heard on the issue.

a class of similarly situated plaintiffs exists." *Mancia*, 2008 WL 4735344, at *2 (quoting *D'Anna*, 903 F. Supp. at 893–94). Plaintiffs' showing can be by affidavit. *Id.* at *3.

Defendants argue that the putative plaintiffs are not similarly situated because they did not work under "the exact *same supervision hierarchy*" and were not subject to the same performance reviews. *See* Defs' Notice Opp'n 11–12. Specifically, PowerComm farmed out its flaggers to Pepco and various subcontractors, who supervised and evaluated those flaggers directly, *see id.* at 12, and therefore Defendants maintain that PowerComm's flaggers did not work "'in a single location, in similar positions, under a single management structure,'" *id.* at 13 (quoting *Syrja*, 756 F. Supp. 2d at 690). According to Defendants, a class cannot exist where Plaintiffs worked for different employers and cannot provide specific proof that each worker was mischaracterized as an independent contractor and denied overtime pay. *Id.* (citing *Bouthner v. Cleveland Constr., Inc.*, No. RDB-11-244, 2012 WL 738578, at *6 (D. Md. March 5, 2012)).

But this case is distinct from *Syrja* and *Bouthner*: even if PowerComm's flaggers were farmed out to various subcontractors, their status and overtime policy was not decided by these diverse supervisors, *see Syrja*, 756 F. Supp. 2d at 688, or by other employers, *Bouthner*, 2012 WL 738578, at *5. They were subject to a single set of standards set by PowerComm, and Defendants repeatedly have discussed these policies and standards in general terms, *see, e.g.*, First Kwasnik Decl. ¶¶ 5–16, without any indication that the nature of a flagger's work or his payment conditions differed among subcontractors, *see supra*. What is more, Plaintiffs have provided evidence to show that Kwasnik, Jr., speaking on behalf of PowerComm, stated that "PowerComm doesn't pay overtime" as a matter of policy. Brown Decl. ¶ 14.

Defendants also oppose conditional certification because of the "disparate factual and employment settings of the individual plaintiffs." Defs.' Decertify Mem. 6; Defs.' Notice

Opp'n 9.  To be sure, in order to determine damages, the Court will need to consider how many hours each employee worked per week and how much each employee earned each week. Defendants suggest that this analysis will be complex because each plaintiff worked for different subcontractors and the defenses that Defendants could assert may vary from plaintiff to plaintiff. *See id.* at 6–11.  In light of the reasons that Plaintiffs likely are employees and not independent contractors, *see supra*, it is not clear that meaningful variation is likely on this issue.   But moreover, it is not clear without additional discovery that these issues would weigh against certification, given that "'[i]ndividual circumstances are inevitably present in a collective action,'" *Butler v. DirectSAT USA, LLC*, 876 F. Supp. 2d 560, 570 (D. Md. 2012) (citation omitted), and that this class cannot be larger than seventy individuals.  *See* Pl.'s Notice Mem. 2; *see also Myles v. Prosperity Mortg. Co.*, No. CCB-11-1234, 2012 WL 1963390, at \*9 (D. Md. May 31, 2012) ("At this point . . . the parties have yet to flesh out proposals for an appropriate methodology [for calculating damages], and it may be difficult to do so without at least some discovery. Until then, therefore, the court is disinclined to preemptively rule that the proposed class is unmanageable, especially where the size of the class is already limited."); *Butler*, 876 F. Supp. 2d at 570 (concluding that defendants' argument that "the allegations made by [plaintiffs] are dissimilar and warrant individualized treatment . . . . 'delve[d] too deeply into the merits of the dispute' at this initial notice stage" and noting that "'[d]ifferences as to time actually worked, wages actually due and hours involved are . . . not significant to [the conditional certification] determination'" (citations omitted)).  And "arguments about the predominance of individualized inquiries and dissimilarities between plaintiff[s] and other employees are properly raised after the parties have conducted discovery and can present a more detailed factual record for the court to

review." *Wlotkowski v. Mich. Bell Tel. Co.*, 267 F.R.D. 213, 219 (E.D. Mich. 2010).  Thus, the possibility of individualized inquiries is not a basis for denying conditional certification.

Accordingly, Plaintiffs' motion to allow notice, construed as a motion for conditional certification, is GRANTED and, for the same reason, Defendants' Motion to Decertify is DENIED without prejudice to refiling once discovery is complete with respect to any additional plaintiffs.

Defendants shall, within fourteen (14) days of the entry of this Order, provide Plaintiffs' counsel with a complete and non-evasive response to Plaintiff's proposed interrogatory,[11] with the exception that Defendants SHALL NOT provide any employee's social security number or date of birth without the express, written permission of that employee.  Further, the proposed "Notice" that Plaintiffs submitted along with their Motion, ECF No. 42-5, IS APPROVED for future use by Plaintiffs in notifying the group of potential plaintiffs.[12]  Plaintiffs' counsel may send a copy of that Notice to all present and former employees of PowerComm and Defendants SHALL POST copies of the Notice at visible places at Defendants' worksites and/or offices throughout the pendency of this litigation.

### E. Scheduling Additional Discovery

I am aware that granting conditional certification may require additional discovery with respect to the claims of any additional plaintiffs.  In order to avoid unnecessary delay or place an undue burden on Defendants, once Defendants respond to the interrogatory approved above, Plaintiffs shall have forty-five days to determine whether additional plaintiffs will be opting in.

---

[11] *See* Fed. R. Civ. P. 37(a)(4).

[12] I am aware that there have been accusations in this case that Plaintiffs' counsel has approached potential plaintiffs in a manner prohibited by the Maryland Lawyers' Rules of Professional Conduct ("MRPCs").  *See supra*.  Nothing herein is intended to relieve either party from its obligations under the MRPCs in providing notice to potential plaintiffs.

Within sixty days of this Memorandum Opinion and the accompanying Order, counsel for the parties shall submit a joint status report advising the Court whether additional plaintiffs have opted in and jointly proposing any modifications to the Scheduling Order, ECF No. 9, that may be necessary to allow for additional discovery or motions with respect to those plaintiffs.

## IV. CONCLUSION

For the aforementioned reasons, Defendants' motions for summary judgment will be DENIED;

Plaintiffs' motion for notice, construed as a motion for conditional certification, will be GRANTED;

Defendants' motion for decertification will be DENIED without prejudice;

Defendants SHALL RESPOND to Plaintiffs' proposed interrogatory within fourteen days;

Plaintiffs MAY SEND the proposed Notice to potential plaintiffs, and Defendants SHALL POST copies of the Notice at visible places at their worksites and/or offices; and

The parties SHALL FILE a joint status report within sixty days.

A separate order shall issue.


Dated: <u>March 25, 2014</u>                    <u>         /S/                </u>
                                                Paul W. Grimm
                                                United States District Judge



dsy

27