UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

**Gregory Randolph,**

Plaintiff,

v.                                        Case No.: 8:13-cv-01696-PWG

**PowerComm Construction, Inc., et al.,**

Defendant.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, INVALIDATION OF
"OPT-OUT" FORMS, AND REQUEST FOR SANCTIONS

## 1.  INTRODUCTION AND OVERVIEW

On August 1, 2014, and August 4, 2014, Defendants filed two filings captioned "Notice

of Opt-Out Notice" purporting to withdraw the opt-in filings for twenty-four Opt-In Plaintiffs.

Plaintiffs' counsel, who had not been apprised of or allowed any *ex parte* communications by the

Defendants with their clients, immediately contacted their clients that had purportedly opted out

to learn what had happened.   The results of Plaintiffs' counsel's investigation into Defendants'

conduct shocks the conscious.  Over a period of at least four weeks and following their failure to

secure summary judgment,[1] Defendants threatened to terminate the employment of individuals

who refused to opt-out of the lawsuit; offered to re-hire former employees in exchange for those

---

[1]      Defendants filed summary judgment motions against Plaintiff Randolph at Case 8:13-cv-
01696-PWG Document 20 Filed 08/14/13, against Plaintiff Brown at Case 8:13-cv-01696-PWG
Document 34 Filed 09/27/13, and then against both of them again while the first two were still
pending before the Court at Case 8:13-cv-01696-PWG Document 46 Filed 02/06/14.  A fourth
Motion for Summary Judgment is currently pending before the Court at Case 8:13-cv-01696-
PWG Document 85 Filed 7/24/14.

employees agreeing to opt-out; deceived individuals into signing opt-out agreements by claiming that the opt-out forms were, among other things, "payment plans;" preyed upon one former employee while he was in the hospital under the influence of pain killers; spread false rumors about the possibility of their [undersigned] attorney being disbarred; and quite literally, "hired" one of the Opt-In Plaintiffs, paying him $1,000 (with the promise of more), in order to convince other Opt-In Plaintiffs to drop out of the lawsuit.

Accordingly Plaintiffs move for a preliminary injunction to enjoin Defendants from further *ex parte* harassment of and communication with the Opt-In and to prevent Defendants from continuing to engage in the pattern of coercive and deceitful behavior as is evidenced by the accompanying affidavits.  Additionally, because substantial evidence exists to demonstrate that the purported "Opt-Out" forms were obtained through Defendants' unethical and potentially unlawful behavior, Plaintiffs further move this Court to invalidate those Opt-Out forms filed by Defendants on August 1, 2014, and August 4, 2014.  Finally, because the aforementioned remedies do nothing more than require the Defendants to comport their conduct with the law, Plaintiffs request that, upon a successful showing of liability, the Court enter an Order for liquidated damages against all Defendants as to each Plaintiff and impose a three year statute of limitations.  Plaintiffs posit that Defendants have forfeited their right to claim "good faith" as defense in light of their recent actions.

## 2.  DEFENDANTS COERCED PLAINTIFFS INTO SIGNING PURPORTED OPT-OUT LETTERS

Upon receiving notice of the purported opt-out forms obtained by Defendants, Plaintiffs' counsel instructed their investigators to contact those current and former PowerComm employees named in Defendants' August 1, 2014, and August 4, 2014, Filing of Opt-Out

Notice[s].  As of the filing of this motion Plaintiffs' investigators have spoken with eleven[2] of those PowerComm employees who, according to Defendants, now wish to opt-out.[3]  The plaintiffs with whom the investigators contacted described coercive, unethical, prejudicial, and otherwise improper conduct on the part of Defendants in obtaining the purported opt-out agreements.  In addition to the direct threats of termination or the promise of a paltry sum (in some cases, approximately 1% of the wages owed), a common thread across each encounter is the Defendants' failure to advise the plaintiffs of the right to discuss the offer with their attorney.  Perhaps most importantly, each of the below identified individuals affirm that (s)he would not have signed the opt-out form but-for Defendants' coercion, does not want the court to accept the opt-out form, and wishes to continue as a plaintiff in the lawsuit.

### A. PowerComm's representative approached George Miles with an opt-out form while he was in the hospital and being treated with pain-killers.

George Miles worked as a flagger for PowerComm from April 2009 through December 2013.  Miles Decl. at ¶ 1-2, attached as Exhibit 1.  Miles estimates that PowerComm owes him $29,500 in unpaid overtime wages.  *Id.* at ¶ 5.  Miles, through counsel, filed an Opt-In Notice on April 29, 2014.  *Id.* at ¶ 6.

In July 2014, Miles was in the hospital for an injury. *Id.* at ¶ 7.  Eunise Roosevelt Melton, a representative of PowerComm acting under the direction of Defendant David Kwasnik, Sr.,

---

[2]   It should be noted that Plaintiffs' investigation into the circumstances giving rise to these opt-outs is still ongoing.  The Plaintiffs seek swift injunctive relief because of the urgency of the situation and the continuing nature of Defendants' violation.

[3]   Two of the opt-in Plaintiffs with whom Plaintiffs' investigators spoke - Ernest Allen and Jimmy Missouri – reported to the investigators that they did not feel coerced or intimidated into signing the opt-out forms provided to them by the Defendants through *ex parte* communications.  Moreover, plaintiff Lavelle Gant initially agreed to sign a declaration, he has since refused.  The extent to which Defendants' improper conduct has tainted any decision that these individuals may have otherwise come to on their own is unclear.

visited Miles in the hospital. *Id.*  Melton told Miles that if he agreed to opt-out of the lawsuit, PowerComm would pay him $300 and re-hire him to a flagging position. *Id.*  At no time did Melton or any other PowerComm representative advise Miles that he should speak with his attorney. *Id.* at ¶ 11.  Miles, under the influence of intravenous pain killers, signed the opt-out form presented to him by Melton. *Id.* at ¶ 10.

**B. PowerComm threatened Lamar Young's employment and initiated a rumor that undersigned counsel was going to be subject to disbarment proceedings.**

Lamar Young, a current PowerComm employee, began working as a flagger for Defendants in June 2010.  Young Decl. at ¶ 1-2, attached as Exhibit 2.  Young estimates that PowerComm owes him $2,265 in unpaid overtime wages. *Id.* at ¶ 5.  Young, through counsel, filed an Opt-In Notice on May 6, 2014. *Id.* at ¶ 7.

Over the last several weeks, Young came to learn that management intended to terminate those employees who did not opt-out of the lawsuit against PowerComm. *Id.* at ¶ 8.  Further, Young learned that PowerComm's litigation strategy apparently centered on an attempt to disbar the undersigned attorney. *Id.* at ¶ 9.  In or about July 2014, Arsim Salihu, Defendants' Superintendent, provided Young with an opt-out form and instructed him to sign it. *Id.* at ¶ 10. On July 31, 2014, Salihu provided Young a check for $431 and told him that it was to compensate him for the unpaid overtime. *Id.* at ¶ 11.  Similar to Miles, Young only signed the opt out form because he lacked an alternative income.  He requests that the Court void the form and asks that he is permitted to litigate his claims against PowerComm without improper interference from Defendants. *Id.* at ¶ 15.

**C. PowerComm's Superintendent, Arsim Salihu, explicitly threatened to terminate Rodney Brooks if Brooks did not sign the opt-out form.**

Rodney Brooks, a current PowerComm employee, began working as a flagger for Defendants in December 2013.  Brooks Decl. at ¶ 1-2, attached as Exhibit 3.  Brooks estimates that PowerComm owes him roughly $1,402.50 in unpaid overtime wages.  *Id.* at ¶ 6.  Brooks, through counsel, filed an Opt-In Notice on May 7, 2014.  *Id.* at ¶ 7.

On July 29, 2014, Superintendent Salihu called Brooks and other employees into his office for a meeting. *Id.* at ¶ 8.  During the meeting, Salihu informed Brooks that PowerComm intended to terminate his employment unless he "opted out" of the lawsuit against the company. *Id.*  Brooks affirms that he only signed the opt-out form, because "PowerComm threatened [his] employment."  *Id.*  at ¶ 9.  Brooks asks that the Court void his coercively obtained opt-out form and allow him to proceed in litigating his claims without Defendants' subjecting him to overt threats of retaliation.  *Id.* at ¶ 11.

**D. Shanina Washington only signed the opt-out form because she feared that failure to comply would result in her termination.**

Shanina Washington, a current PowerComm employee, began working as a flagger for Defendants in July 2011.  Washington Decl. at ¶ 1-2, attached as Exhibit 4.  Washington estimates that PowerComm owes her roughly $1,735.78 in unpaid overtime wages.  *Id.* at ¶ 6. Washington, through counsel, filed an Opt-In Notice on May 2, 2014.   *Id.* at ¶ 7.

From mid-July 2014 through to the present, Washington learned that PowerComm management intended to terminate the employment of those individuals who did not opt-out of the lawsuit against the company.  *Id.* at ¶ 8.  On August 1, 2014, Superintendent Salihu approached Washington, handed her an opt-out form, and instructed her to sign it. *Id.* at ¶ 9.  At no time did Salihu advise Washington that she should – or even could – speak with her attorney.

*Id.* at ¶ 12.  Again, Washington affirms that she only signed the opt-out form because she feared losing her job and, as with each of the other identified employees, asks that the Court invalidate the purported opt-out form. *Id.* at ¶ 13.

### E. Defendant Kwasnik called Samuel Hegwood directly and offered him a bribe of $500 in order to opt-out.

Samuel Hegwood worked as a flagger for PowerComm from in or about 2004 through December 2012.  Hegwood Decl. at ¶ 1, attached as Exhibit 5.  Hegwood estimates that PowerComm owes him roughly $57,590 in unpaid overtime wages.  *Id.* at ¶ 5.  Hegwood, through counsel, filed an Opt-In Notice on May 28, 2014.  *Id.* at ¶ 6.

In July 2014, Kwasnik called Hegwood and offered to pay him $300 in exchange for Hegwood agreeing to opt-out of the lawsuit against PowerComm.  *Id.* at ¶ 7.  Melton, another plaintiff who Defendants claim has opted out of this matter, also pressured Hegwood to sign the opt-out form.  *Id.*  Hegwood initially refused Kwasnik's offer but accepted after Kwasnik increased his offer to $500.  *Id.* at ¶ 8.  Hegwood affirms that he was not given the opportunity to speak with his attorney before signing the opt-out agreement.  *Id.* at ¶ 10.  Hegwood does not want the Court to accept his opt-out form and would like to continue as a plaintiff in the lawsuit. *Id.* at ¶ 11.

### F. David Kwasnik presented Robin Melton with an opt-out form under the false pretense that her signing it would allow her to claim the money that she was owed.

Robin Melton worked as a flagger for PowerComm from April 2003 through November 2011.  Melton Decl. at ¶ 1, attached as Exhibit 6.  Robin Melton estimates that PowerComm owes her roughly $47,040 in unpaid overtime wages.  *Id.* at ¶ 5.  Robin Melton, through counsel, filed an Opt-In Notice on May 1, 2014.  *Id.* at ¶ 6.

In July 2014, Kwasnik approached Robin Melton and offered her a $300 check. *Id.* at ¶ 7. Kwasnik presented her with an opt-out form and told her that, by signing the form, she would be able to recover the rest of the money that PowerComm owes her. *Id.* Robin Melton did not know that by signing the form she had opted out of the lawsuit. *Id.* In fact, it was not until August 4, 2014, when Robin Melton spoke with her legal representatives that she learned she had opted out. *Id.* at ¶ 8. Robin Melton does not want the Court to accept her opt-out form and, after now having had the opportunity to speak with her legal representatives, wants to continue as a plaintiff in the lawsuit against Defendants. *Id.* at ¶ 9.

### G. PowerComm's representatives offered Gregory Eubanks four payments of $300 and the promise of a position at PowerComm if he agreed to sign the opt-out forms.

Gregory Eubanks worked as a flagger for PowerComm from March 2009 through June 2013. Eubanks Decl. at ¶ 1, attached as Exhibit 7. Eubanks estimates that PowerComm owes him roughly $1,050 in unpaid overtime wages. *Id.* at ¶ 5. Eubanks, through counsel, filed an Opt-In Notice on April 28, 2014. *Id.* at ¶ 6.

In July 2014, Melton offered Eubanks $300 and a position working as a flagger with PowerComm if he agreed to opt-out of the lawsuit. *Id.* at ¶ 7. Melton required Eubanks to sign the opt-out form as a condition of his employment with PowerComm. *Id.* Melton also told Eubanks that signing the form would ensure that he received three additional payments of $300. *Id.* Melton did not explain that by signing the form, Eubanks was opting out of the lawsuit against PowerComm. *Id.* To make matters worse, PowerComm has reneged on its promise to Eubanks. To date, no one from PowerComm has contacted him about starting his new job nor has he received the additional $300 payments. *Id.* at ¶ 8-9. PowerComm did not provide Eubanks with an opportunity to speak with his attorney prior to signing the opt-out form. *Id.* at ¶

10. He did not understand that it impacted his rights to secure his unpaid overtime, and does not want the Court to accept his opt-out form. *Id.*

**H. PowerComm's paid Opt-In Plaintiff Roosevelt Melton $1,000 in exchange for his agreeing to help "get people out of the lawsuit."**

On August 4, 2014, Nicole Raviele, law clerk to the undersigned attorney, contacted Roosevelt Melton to learn the reasons behind his decision to opt-out of the present litigation. Raviele Decl. at ¶ 1-4, attached as Exhibit 8. Melton explained to Raviele that Defendant Kwasnik gave him an initial $1,000 in exchange for "getting people to opt-out of the lawsuit." *Id.* at ¶ 5. Melton further explained that Kwasnik promised him more money if Melton was able to convince other plaintiffs to opt-out. *Id.* After Raviele asked Melton whether he was willing to sign a declaration to that effect, Melton refused to speak with her until he "called Mr. Kwasnik to see how much more money he could expect to receive and when he could expect to receive it," or words to that effect. *Id.* at ¶ 6. Melton continued that if Kwasnik refused to pay him more money or provide a specific time as to when he would be paid, Melton wanted to opt back in to the lawsuit. *Id.* at ¶ 7.

## 3. RELEVANT LEGAL AND ETHICAL STANDARDS

### A. Preliminary Injunction Framework

A District Court may issue a preliminary injunction in order to prevent irreparable harm before trial. *See* Fed. R. Civ. P. 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n,* 575 F.3d 342 (4th Cir. 2009) (conforming the *Blackwelder* framework to the Supreme Court's ruling in *Winter*) (vacated on

8

other grounds).   The moving party must prove these elements by a preponderance of the

evidence.  *See UBS Painwebber, Inc. v. Aiken,* 197 F. Supp. 2d 436, 440 (W.D.N.C. 2002) (1st

Cir. 1996) (granting plaintiff's motion for a preliminary injunction).

"The determination whether to grant a preliminary injunction is expected to be based on

'evidence that is less complete than in a trial on the merits.'" *Mancia v. Mayflower Textile Servs.*

*Co.*, CIV.A. CCB-08-273, 2008 WL 4735344 (D. Md. Oct. 14, 2008) (citing *Univ. of Texas v.*

*Camenisch,* 451 U.S. 390, 395 (1981)).  "Therefore, the court may consider otherwise

inadmissible evidence in making its determination."  *Id.*  Such otherwise inadmissible evidence

also includes "affidavits that may prove later to be inadmissible at trial." *Id.* (citing *United States*

*ex rel. Taxpayers Against Fraud v. Link Flight Simulation Corp.*, 722 F.Supp. 1248, 1252

(D.Md.1989)).

**B.  Limiting Party to Party Communications**

**i.      Legal Standard**

"[A] district court has both the duty and the broad authority to exercise control over a

class action and to enter appropriate orders governing the conduct of counsel and parties."  *Gulf*

*Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *see also Hoffmann-La Roche Inc. v. Sperling,* 493

U.S. 165, 171 (1989) (vesting the same authority in trial courts to enter such orders in ADEA

collective actions).[4]  In making a determination as to how to limit contact between the parties, a

court's decision "should be based on a clear record and specific findings that reflect a weighing

of the need for a limitation and the potential interference with the rights of the parties*." Id.*  The

---

[4]      It is worth noting that *Gulf Oil* dealt with pre-certification communications with putative
class members.  The Court's analysis is even more forceful when applied to communications
where, as in the instant case, defendants are communicating with plaintiffs known to be
represented by counsel.

order should be based on "a specific record showing by the moving party of the particular abuses by which it is threatened." *Id*. at 102

"In order for the moving party to show that a limitation is necessary, '[t]wo kinds of proof are required. First, the movant must show that a particular form of communication has occurred or is threatened to occur. Second, the movant must show that the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation.'" *The Kay Co., LLC v. Equitable Prod. Co*., 246 F.R.D. 260, 262 (S.D.W. Va. 2007) (citing *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697-98 (S.D.Ala.2003)). "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Id.*

## ii.     Ethical Considerations

Where a Rule of Professional Conduct has been violated, "[f]ederal courts have inherent authority to discipline attorneys who appear before them for conduct deemed inconsistent with ethical standards imposed by the court." *Zachair, Ltd. v. Driggs*, 965 F.Supp. 741, 749 (D. Md. 1997).  The MRPC provides that, "a lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so."  *MRPC* 4.2(a).  MRPC Rule 8.4(a) defines as professional misconduct a lawyer's attempt to violate a rule through the acts of another.  *See MRPC* 8.4(a) ("It is professional misconduct for a lawyer to violate or attempt to violate the Maryland Lawyers' Rules of

10

Professional Conduct, <u>knowingly assist or induce another to do so, or do so through the acts of</u> <u>another</u>.") (Emphasis added).

The American Bar Association has issued guidance on the extent to which an attorney may advise a client on direct contact with represented persons. *See* American Bar Association, Formal Opinion 11-461, *Advising Clients Regarding Direct Contacts with Represented Persons* (Aug. 4, 2011), attached hereto as Exhibit 9. The ABA concludes that:

> Prime examples of overreaching <u>include assisting the client in securing from the</u> <u>represented person an enforceable obligation,</u> disclosure of confidential information, or admissions against interest without the opportunity to seek the advice of counsel. To prevent such overreaching, <u>a lawyer must, at a minimum,</u> <u>advise her client to encourage the other party to consult with counsel before</u> <u>entering into obligations,</u> making admissions or disclosing confidential information.

*Id.* (emphasis added). Though there do not appear to be any Maryland cases directly on point, other jurisdictions have found ethical violations where an attorney prepared documents of legal significance with the knowledge that his client would then use those same document in communication with another represented party. *See, e.g., In re Marietta*, 223 Kan. 11, 569 P.2d 921 (1977) (finding a sanctionable offense where an attorney prepared a release of liability for his client with the knowledge that the client was going to send the release to a party opponent who was represented by counsel) (appended hereto as Exhibit 10); *Miano v. AC & R Advertising, Inc.*, 148 F.R.D. 68, 82 (S.D.N.Y. 1993) (stating that "where a client directly asks his or her attorney whether he should approach a represented adversary, the attorney may not ethically recommend or endorse such action"); *Massachusetts Bar Op.* 82-8 (1982) (a lawyer who has prepared settlement agreement on client's behalf should discourage client from specifically discussing settlement with other party or directly sending letter that addresses settlement without consent of that party's lawyer).

## 4.  ARGUMENT

### A.  Plaintiffs easily satisfy each prong of *Winter's* four part test for a preliminary injunction.

As noted, the Fourth Circuit requires that a plaintiff seeking a preliminary injunction must demonstrate, by a preponderance of the evidence, a likelihood of success on the merits, irreparable harm absent preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter.,* 555 U.S. at 20.  Plaintiffs meet their burden in every respect.

Taken in converse order, it nearly goes without saying that an injunction is in the public interest.  First, much of Defendants' conduct is almost certainly a violation of the Fair Labor Standards Act's ("FLSA") anti-retaliation provision.  As supported by Young, Brooks, and Washington, Defendants threatened plaintiffs with termination of their employment unless they opted out of the present litigation.  Exhibits 2, 3, and 4.  By proscribing acts of retaliation for protected activity in the FLSA "Congress sought to foster a climate in which compliance with the substantive provisions of the Act would be enhanced."  *Mitchell v. Robert DeMario Jewelry, Inc.* 361 U.S. 288, 335 (1960).  To this point, the Court should not, by declining to issue a preliminary injunction, endorse conduct that is unlawful and contrary to clear Congressional intent.[5]

With regards to equitable considerations, it is difficult to conceive how, if at all, an Order precluding Defendants from engaging in *ex parte* communications with Plaintiffs regarding the pending litigation would result in any burden whatsoever on Defendant.  Discussed more fully

---

[5]     Putting aside the threats of retaliation and focusing only on the bribes (paltry sums or promises of re-employment) offered to plaintiffs Miles, Hegwood, and Eubanks to settle their claims, settlement negotiations should be held between and among competent counsel; the Court cannot permit, for example, one party barging into the hospital room of another with offers of reinstatement and settlements amounting to pennies on the dollar. *See* Exhibit 1.

below, Plaintiffs recognize and appreciates Defendants' right and need to communicate with current employees regarding business-related tasks and work objectives.  Defendants' conduct to date, however, is simply beyond the pale.  PowerComm's communications with several plaintiffs have devolved into threats and *ex parte* bribes of re-instatement.  These are not "borderline" communications.  For example, Robin Melton was not even aware that she had opted out of the litigation until she had the opportunity to speak with her attorney.  Exhibit 6 at ¶ 8.  PowerComm representatives confronted George Miles while he was in the hospital under the influence of pain-killers.  Exhibit XX at ¶7-10.  Permitting the Defendants to continue engaging in deceitful and harassing conduct is not an "equitable consideration."  All Plaintiffs seek in an order to limit communications is to prohibit the Defendants from interfering with the legal process.

 Plaintiffs will be irreparably harmed without the issuance of an injunction.  Already, Defendants have induced at least nine plaintiffs into signing opt-out agreements under false pretenses or threats of retaliation.  Defendants have coerced some to opt-out of litigation for as little as 1% of the wages owed to them.  Exhibit 1; Exhibit 5.  If such conduct alone was insufficient to demonstrate irreparable harm, the prejudice is compounded by the fact that Defendants, in addition to filing twenty-three purported Opt-Out Notices on August 1, 2014, filed yet another Opt-Out Notice on August 4, 2014.  There is little reason to believe that Defendants, absent a Court order, will discontinue their efforts of improperly targeting the remaining plaintiffs and coercing them into signing away their rights for next to nothing.

A discussion regarding the likelihood of success on the merits is largely inapplicable to the instant motion.  Plaintiffs do not seek to prevent Defendants from engaging in any conduct that they should not otherwise be engaging.  To the extent that such a showing is required,

Plaintiffs respectfully refer the Court to Defendants' three previously filed and unsuccessful Motions for Summary Judgment.[6]

**B. An injunction limiting the communications between the parties is appropriate in light of Defendants' willful and abusive conduct.**

This Court should look to the standards adopted by its sister court in the Southern District of West Virginia to determine whether limiting party to party contact is appropriate.  As noted, the Southern District of West Virginia, for the purposes of limiting party to party communication, requires only that the movant show a particular form of communication has occurred and that "the particular form of communication at issue is <u>abusive in that it threatens the proper functioning of the litigation</u>."  *The Kay Co., LLC,* 246 F.R.D. at 262 (emphasis added).  The *Kay Co.,* opinion is illuminating insofar as it provides an example of where a court found it appropriate to *decline* to limit communication.  In stark contrast with the instant case, the Court in *Kay Co.,* found:

> [N]o allegations that the defendants have distributed false, misleading, or confusing statements. The plaintiffs have not directed the court to any evidence which indicates that the defendants have attempted to coerce putative members into excluding themselves from the class or undermined cooperation with or confidence in the plaintiffs' counsel.

*Id.* at 263.  In this case, however, Defendants have misrepresented the legal significance of the opt-out forms; coerced Plaintiffs to drop out of litigation for fear of losing their jobs; and have promulgated false rumors about the impending disbarment of Plaintiffs' undersigned counsel.

It is again worth noting that the standards articulated by the Supreme Court in *Gulf Oil* and by the Southern District of West Virginia in *Kay Co*. are designed to limit communications

---

[6]      To this point, it seems a superfluous exercise to recount all of Plaintiffs' arguments in support of the ultimate conclusion that Plaintiffs, for the purposes of the FLSA, were functioning as employees and not independent contractors.  This is especially true given the numerous dispositive motions filed by Defendants (and Plaintiffs' responses thereto).  To the extent that the Court does desire such briefing, Plaintiffs will readily provide same.

between a party and putative class members.  In the instant case where the class members are known to be represented by counsel, Defendants' communications and surrounding conduct should be held to an even higher standard.  Moreover, Defendants conduct comes on the heels of Plaintiffs filing an Amended Rule 26(a)(1) disclosure specifically identifying setting forth the damages of and representation of, *inter alia*, the twenty-four individuals for whom Defendants filed Opt-Out forms.  Moreover, the undersigned has already propounded discovery for these Plaintiffs. *See* Case 8:13-cv-01696-PWG Document 86 Filed 07/28/14.

## 5.  REQUEST FOR SANCTIONS

### A.  Sanctions Against Defendants

Courts may order judgment by default "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process."  *First Mariner Bank v. Resolution Law Grp., P.C.*, CIV. MJG-12-1133, 2014 WL 1652550 (D. Md. Apr. 22, 2014).  In determining the nature and type of sanctions to be applied, a court must consider the following factors:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Projects Mgmt. Co. v. Dyncorp Int'l* LLC, 734 F.3d 366, 373-74 (4th Cir. 2013) (discussing the appropriate factors for consideration in the context of discovery violations).  As is hopefully made clear in the instant brief, Plaintiffs' request for a preliminary injunction to prohibit Defendants from engaging in further harassing *ex parte* communication with Plaintiffs should not, in itself, be considered as a "sanction."  In seeking injunctive relief, Plaintiffs are merely

asking the Court to require that Defendant comport its conduct to the law or be found in violation of a Court order.

Defendants' willful and abusive conduct should, however, lead to sanctions to ensure such bad behavior does not go unpunished. To this point, there is no doubt as to Defendants' culpability in this matter. The victims, absent appropriate sanctions, will be severely prejudiced insofar as many have seen their rights forfeited through fraudulently or coercively obtained Opt-Out forms. Defendants' conduct has severely impaired the Court's ability to oversee the administration of justice insofar as "settlement" discussions are being made *ex parte* and under explicit threats of retaliation. And, as discussed, the public interest will be severely harmed should Defendants' conduct become the norm within the courthouse.

Despite the egregiousness of Defendant' conduct, Plaintiffs are not seeking a judgment in their favor as a result of Defendants' malfeasance.[7] Rather, Plaintiffs seek to return to the state of litigation prior to Defendants' violative conduct.[8] Moreover, Plaintiffs respectfully request that, in addition to an award of fees and costs associated with bringing the instant motion, the Court invalidate the opt-out forms because they were obtained by coercion. *See Wang v. Chinese Daily News, Inc.,* 623 F.3d 743, 757 (9th Cir. 2010) *cert. granted, judgment vacated*, 132 S. Ct. 74, 181 L. Ed. 2d 1 (U.S. 2011) (district court did not abuse discretion in its decision to invalidate opt-out forms and restrict defendant's ability to communicate with class members); *see also Guifu Li v. A Perfect Day Franchise, Inc.,* 270 F.R.D. 509, 518 (N.D. Cal. 2010) (invalidating opt-out forms prior to class certification that were obtained by coercion).

---

[7] This is best left to the discretion of the Court.

[8] This all being said, Plaintiffs are cognizant of the fact that all of the circumstances leading to the coercively obtained opt-in forms have not yet come to light. For this reason, Plaintiffs reserve the right to augment this request for sanctions to the extent that Defendants have engaged in additional but presently unknown improprieties.

Moreover, Plaintiffs proffer that Defendants have forfeited the right to claim that their "act or omission giving rise to such action was in good faith."  In light of their undeniable conduct, they should be subject to a finding of full liquidated damages without any further briefing on the matter.  *See* 29 U.S.C. § 260.  To this point, Plaintiffs request only that the Court enter an Order for liquidated damages against all Defendants as to each Plaintiff *only in the event that Plaintiffs successfully establish liability*.  Similarly, Plaintiffs request that the Court impose a three year statute of limitations in light of Defendants' undisputed bad faith, as evidenced in this motion.  *See,* 29 U.S.C. § 255.  Because these sanctions will only be realized in the event that Plaintiffs successfully establish liability, Plaintiffs do not believe that they will impose an unwarranted hardship upon Defendants.

**B.  Sanctions Against Defense Counsel**

One factor conspicuously absent from the above discussion is the blameworthiness of defense counsel.  Defendants have already invoked a reliance on the advice of counsel as a defense to liquidated damages.  This, alone, should be sufficient to compel Mr. Bohn, the lawyer who purportedly advised Defendants, to serve as a fact witness and preclude him from further representing Defendants.  *See* MRPC 3.7(a).[9]  In addition and with respect to recent events, Plaintiffs respectfully assert that Defense counsel should be called to explain to the Court its role in obtaining the opt-out forms from the identified Plaintiffs.[10]

In both the August 1, 2014, and August 4, 2014, filings, defense counsel writes:

---

[9]     This issue was the subject of Plaintiffs' filing at Case 8:13-cv-01696-GJH Document 84 Filed 07/07/14.

[10]     The Fourth Circuit actually provides that a court "must" consider "the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney" in determining the nature and extent of the sanctions to be imposed.  *See Projects Mgmt. Co*., 734 F.3d at 373-74 (4th Cir. 2013).

17

> As plaintiffs have been presumably represented by plaintiffs' counsel, defendants' counsel has had no contact of any kind with the plaintiffs who have executed the Notices requesting that they should no longer be considered as a plaintiff in the captioned litigation. Defendants' counsel has had no direct communication with any of the plaintiffs who have opted out.

See Case 8:13-cv-01696-GJH Document 87 Filed 08/01/14; Case 8:13-cv-01696-GJH

Document 88 Filed 08/04/14.  Including such a disclaimer evidences a knowledge of the

impropriety of the filing on the part of defense counsel.  Indeed, the language reveals

that defense counsel was aware that it was improper to deal with the opt-in Plaintiffs to

the exclusion of their counsel, yet they made no attempt to stop or report the above

discussed communications to the undersigned attorneys.

Moreover, it is undisputed that defense counsel filed the opt-out forms on

Defendants' behalf, and Defense counsel cannot now hide behind a claim of having "no

<u>direct</u> communication" when it is their affirmative actions that played a role in

Defendants' transgressions.  Other jurisdictions take a lawyer to task when he prepares

and files a legal document "knowing its significance and its intended use [and] caus[ing]

his client to communicate with [the opposing party] without the consent of [the opposing

party's] attorney."  See Exhibit 10; see also MRPC 4.2; MRPS 8.4.  Courts in Maryland

should hold their attorneys to the same standard.

*By Counsel*
/s/ Nicholas Woodfield
R. Scott Oswald, D. Md. Bar No. 25391
Nicholas Woodfield, D. Md. Bar No. 15474
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via

electronic mail on this the 5th day of August, 2014, to:

Geoffrey Bohn, Esq.
BOHN & KOURETAS, PLC P.O. Box 101685
Arlington, Virginia 22210
(703) 599-7076
(703) 842-8089 (facsimile)
bohn_kouretas_plc@yahoo.com
Attorney for Defendant

/s/ Nicholas Woodfied
Nicholas Woodfield, D. Md. Bar No. 15474
R. Scott Oswald, D. Md. Bar No. 25391
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Counsel for Plaintiffs*