**United States District Court
for the District of Maryland
Greenbelt Division**

---

**GREGORY RANDOLPH,** *et al.,*

                           Plaintiffs,

v.

**POWERCOMM CONSTRUCTION, INC.,** *et al.,*

                     Defendants.

Case No.: 8:13-cv-01696-GJH

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT AND, IN THE ALTERNATIVE, TO DISQUALIFY GEOFFREY M.
BOHN <u>AND ROBERT A. BATTEYAS COUNSEL OF RECORD FOR DEFENDANTS</u>**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................... ii

Introduction ................................................................................................................ 1

Statement of Undisputed Material Facts ................................................................... 3

   I.     Plaintiffs were employer as Flaggers by Defendants ......................................... 3

   II.    Defendants failed to properly analyze whether Plaintiffs were properly
         classified as independent contractors .............................................................. 11

   III.   Defendants intentionally benefitted from misclassifying Plaintiffs as
         independent contractors .................................................................................. 16

   IV.   Defendants failed to produce discovery for 20 opt-in Plaintiffs ..................... 17

Summary Judgment Standard ................................................................................... 22

Argument ................................................................................................................... 23

   I.     Defendants are "Employers" and Plaintiffs are "Employees" under
         the FLSA ......................................................................................................... 23

   II.    Defendants did not act in good faith when it misclassified Plaintiffs
         as independent contractors. .............................................................................. 26

        *A.  Defendants own policy manual details the difference between
            independent contractors and employees and put Defendants
            on notice of their misclassification of Plaintiffs.* ................................... 27

        *B.  Defendants never attempted to ensure that Plaintiffs
            were properly classified.* ........................................................................ 29

        *C.  Defendants classified Plaintiffs as independent contractors
            for financial benefit.* ............................................................................. 31

   III.   Defendants' actions demonstrate a reckless disregard for the
         FLSA and are therefore willful. ...................................................................... 33

   IV.   Defendants failed to properly maintain time records and
         therefore fail to prove that 17 Opt-In Plaintiffs are time-barred. .................. 34

   V.    Plaintiffs have submitted interrogatory answers with
         signed verification pages for 61 Plaintiffs. .................................................... 41

   VI.   Defendants incorrectly argue Plaintiffs Gorham and
         Jordan be dismissed from the case. ................................................................ 42

   VII.  Opt-In Plaintiffs who opted in after the Court's deadline
         should not be dismissed. .................................................................................. 43

   VIII. In the alternative, Plaintiffs move to exclude Geoffrey Bohn
         and Robert Battey as counsel. ........................................................................ 43

Conclusion ................................................................................................................ 44

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................22, 23, 36

*Anderson v. Mt. Clemens Pottery Co.* 328 U.S. 680 (1946) ........................................35, 40

*Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184 (S.D.N.Y. 2003).........25,

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983)...........................................................24

*Falk v. Brennan*, 414 U.S. 190 (1973) .......................................................................23, 24

*MacGregor v. Farmers Ins. Exch.*, 2014 WL 4199140 (D.S.C. Aug. 20, 2014).........35, 36

*McLaughlin v. Richland Shoe Co.* 486 U.S. 128 (1988)...................................................33

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ..............................................23

*Schultz v. Capital International Security, Inc.*, 466 F.3d 298 (4th Cir. 2006).............23, 24

*Trans World Airlines, Inc. v. Thurston* 469 U.S. 111 (1985) ......................................27, 33

*United States v. Rosenwasser*, 323 U.S. 360 (1945).........................................................23

**Rules**

Federal Rule of Civil Procedure 37 ..........................................................................41, 42

Federal Rule of Civil Procedure 56 ...........................................................1, 2, 22, 40, 41

Maryland Professional Rule of Conduct Rule 3.7. ....................................................43, 44

**Statutes**

29 C.F.R. § 791.2 ...............................................................................................................23

29 U.S.C. § 203.............................................................................................................23, 24

29 U.S.C. § 260.............................................................................................................26, 27

COMES NOW Plaintiffs Gregory Randolph, *et al*., by and through counsel, and file this Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment and in support of Plaintiffs' Cross-Motion for Summary Judgment.   For the reasons outlined herein the Court should deny Defendants' Motion for Summary Judgment and instead grant Plaintiffs' Cross-Motion for Summary Judgment on the issues of liability, Defendants' lack of good faith, and willfulness (with the determination of Plaintiffs' respective hours worked to be the sole issue to be tried to a jury).[1]   In the alternative, Plaintiffs move to disqualify Geoffrey M. Bohn and Robert A. Battey as counsel of record for defendants, as in the event that this Court does not grant Plaintiffs' motion for summary judgment on the issues of Defendants' lack of good faith and/or willfulness, Plaintiffs will call Geoffrey M. Bohn and Robert A. Battey as witnesses in this matter to prove these issues.

## **INTRODUCTION**

Plaintiff Randolph filed the complaint in this matter on June 12, 2013.  On July 29, 2013, Plaintiff Randolph served the Plaintiff's first interrogatories, request for production and requests for admissions to Defendants.  On August 14, 2013, Defendants filed a Motion for Summary Judgment as to Plaintiff Gregory Randolph's Individual Claims pursuant to Fed. R. Civ. P. 56, without responding to Plaintiff's discovery.  Plaintiff Dana Brown filed a Notice of Consent to Opt-In on August 27, 2013.  On August 29, 2013, Defendants filed a Motion to Stay Discovery.

---

[1] Defendants argue that 5 Opt-In Plaintiffs have no damages according to the Federal Rules of Civil Procedure 26 Amended Disclosures filed by Plaintiffs.  Plaintiffs filed Opt-In forms and, upon inquiry, provided Plaintiffs' counsel with information regarding their hours worked and what dates they were employed by PowerComm.  Plaintiffs' counsel then used this information as the basis for their amended disclosures.  As such, Plaintiffs take no further position on this point.

1

On August 30, 2013, Defendants responded to Plaintiffs' discovery.  The Court denied Defendants' Motion to Stay Discovery on September 9, 2013, and on September 27, 2013, Defendants filed a separate Motion for Summary Judgment as to Plaintiff Dana Brown's Individual Claims pursuant to Fed. R. Civ. P. 56.

On November 5, 2013, Plaintiffs filed a Motion to Allow Notice to Similarly Situated Employees.  Defendants' opposed Plaintiffs' Motion on November 22, 2013.  Before the Court ruled on Plaintiffs' Motion for Notice, Defendants' filed a Motion to Decertify Collective Action or Alternatively, Motion for Summary Judgment.  On March 26, 2014, Judge Grimm denied Defendants' motions for summary judgment and motion for decertification, and granted Plaintiffs' motion for notice.  Plaintiffs issued notice and began filing opt-in notices on April 28, 2014, and 63 more individuals filed executed opt-in forms.  Accordingly, in addition to Plaintiff Randolph, there are now 64 Opt-In Plaintiffs in this matter (for a sum total of 65 Plaintiffs).

On July 2, 2014, Defendants filed Motion for Protective Order and, Additionally, Motion for Summary Judgment as to Non-Recoverability of Liquidated Damages.  On August 1, 2014 and August 4, 2014, Defendants filed two filings captioned "Notice of Opt-Out Notice" purporting to withdraw the opt-in filings for 24 Opt-in Plaintiffs after soliciting attempted settlements and complete releases from these individuals without informing Plaintiffs' counsel of these communications.  On August 5, 2014, Plaintiffs filed a Motion for Preliminary Injunction, Invalidation of "Opt-Out" forms, and Request for Sanctions.  On August 12, 2014, the Court held an Evidentiary Hearing on the issue and then issued a protective order and invalidated the opt-out forms.[2]  The Court also required Defendants to provide a copy of the order and notice of invalidation to the affected individuals.

---

[2] This matter was reassigned to Judge George Hazel on June 5, 2014.

On September 15, 2014, the Court held a telephonic hearing on Defendants' request for additional 45 day extension to respond to Plaintiffs' Third Requests for Production of Documents.  The Court granted the extension and also afforded Plaintiffs an additional month to review the document production and propound discovery based upon any issues that developed in response to Defendants' production.  In total, Defendants produced 10,333, including178 pages of spreadsheet calculations, marked as PCI010038-205 and PCI010306-317, purportedly representing hours worked by certain Plaintiffs.  Defendants openly acknowledge that they failed and/or refused to look for or produce any responsive documents for 22 of the Opt-In Plaintiffs, claiming (although without providing any proof) that these individuals' claims are time barred.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.        Plaintiffs were employed as Flaggers by Defendants.

Defendants David Kwasnik, Sr. and PowerComm Construction, Inc. employed Plaintiffs as flaggers for overhead and underground electrical work performed near vehicular traffic. Defendants use flaggers to control traffic when two way roads are reduced to one lane and when traffic must alternate in direction.  Ex. 1, Randolph Declaration, at ¶ 2.  They guide motorists to follow the traffic laws, but they are not able to enforce the law.  Ex. 1 at ¶ 2.  PowerComm currently employs approximately thirty flaggers.  Ex. 2, PowerComm Rule 30(b)(6) Depo., at 116:19-21.

Plaintiffs directed traffic through construction sites or other temporary traffic control zones past an area using signs or flags.  Ex. 1 at ¶ 2.  Plaintiffs were responsible for maintaining the safety and efficiency of traffic, as well as the safety of road workers, while allowing construction, accident recovery or other tasks to proceed.  *Id.*  During the Plaintiffs' employment with Defendants, they regularly paid the Plaintiffs straight time for all hours they worked in

excess of 40 hours a week.  *Id.* at ¶ 5.  Defendants treated the flaggers as independent contractors

in name only, as Plaintiffs had no control over when they had to show up for work, where to

show up for work, what to wear, and what their hours would be.  *Id.* at ¶ 6.

Plaintiffs could not work for any other employers during the day, as they did not have

any discretion to not show up to work for Defendants.  Ex. 1 at ¶ 8.  Defendants supplied the

vehicle Plaintiffs traveled in, and Defendants provided the flagging equipment.  *Id.* at ¶ 6, 9.  The

work was unskilled labor, as the hardest part of the job was standing in traffic all day without

getting hit by a car.  *Id.* at ¶ 9.  However, it was necessary for Defendants to employ flaggers for

PEPCO work, as without the flaggers, it could not do the electrical contracting work in and

around the roads it was working on.  *Id.*

Plaintiffs commenced work for Defendants each day by reporting to a PEPCO yard in

Maryland at 7:00 am and Plaintiffs would record their start time as 7:00am on their time sheets.

Ex. 1 at ¶ 10.  Plaintiffs would then ride to the work site for the day.  *Id.*  Some flaggers were

responsible for driving the crew to the worksite.  *Id.*  During the day, Plaintiffs would direct

traffic around projects.  *Id.* at ¶ 11.  Plaintiffs did not drive any vehicles or machinery, and the

only work that Plaintiffs did was directing traffic.  *Id.*  At the end of the day, Plaintiffs returned

to the PEPCO yard and recorded his ending time.  *Id.*  When Plaintiffs worked in excess of forty

hours in a week, Defendants still paid straight hourly rate—it did not pay overtime wages at a

rate of time and a half even though Plaintiffs were employees.  *Id.* at ¶ 13.  Defendants

acknowledge paying Plaintiffs as both W2 employees and 1099 independent contractors at

different times even though Plaintiffs were doing the same work at all times.  Ex. 2,

PowerComm Rule 30(b)(6) Depo., 10/11/13, at 16:18-17:8.

The only training Mr. Randolph ever had to be a flagger was a one-day course offered by the American Traffic Safety Services Association, which provided an introduction to temporary traffic control in work zones for individuals who work in the field installing and removing traffic control devices.  Ex. 1 at ¶ 4.  PowerComm supervisor Eunise Roosevelt Melton taught the class, and PowerComm required that flaggers attend.  Ex. 1 at ¶ 4; Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 90:20-91:6.  After taking this course that lasted about two hours and passing a test, an individual was certified as a flagger.  Ex. 1 at ¶ 4.  However, not all flaggers took this course.  For example, Plaintiff Brown learned how to flag from Mr. Randolph.  Ex. 19, Brown Declaration at ¶ 4.

PowerComm acknowledges that its flaggers are similarly situated and do the same job:

```
26:9     Q   I want to get the term right.  I noticed
10  before that you call them traffic controllers in
11  some of the documents.  If I call them flaggers or
12  traffic controllers, is that fair to use those terms
13  interchangeably?
14     A   Yeah.  For me it's the same.  Yeah.
15     Q   In terms of the people who are working as
16  flaggers or traffic controllers, are their jobs the
17  same or are there different tiers or different types
18  of traffic controllers or flaggers?
19     A   No.  No.  ATSSA regulates what traffic
20  control is all about.  So we strictly go by federal
21  and state regulations.  But in the state of Maryland
22  and D.C., ATSSA rules.  So American Traffic Safety
                           27
1  Association is who rules the bay on that.
2          So you have to follow their guidelines.
3  So we can't go outside those guidelines.  It's
4  against the law.  So whatever ATSSA tells us we have
5  to do, that's what we do.
6     Q   And I'll ask my question and you are doing
7  a good job.  I'm just trying to make sure I get
8  everything.  Greg Randolph was a traffic controller,
9  Dana Brown was a traffic controller and they both
10  are plaintiffs in this suit.  You employ other
11  traffic controllers and have employed other traffic
```

5

12   controllers over the years; correct?
13      A   Correct.
14      **Q   In terms of the jobs they do, is there any**
15   **distinction or differentiation between the work that**
16   **they do for you such that there is one who is -- has**
17   **some specialization or some special duties if say**
18   **there is above-ground work or below-ground work or**
19   **if there is a storm or something like that?  Is**
20   **there any distinction between the job duties and**
21   **responsibilities of the flaggers that you employ and**
22   **have employed?**
                        **28**
1      **A   No**.
2      Q   I saw that there was a gentleman who
3   reported that he was a supervisor among the
4   flaggers.  How is his job different than the
5   flaggers, than the flaggers that he supervises?
6        MR. BOHN:  Which person?
7   BY MR. WOODFIELD:
8      Q   What I'm wondering is do you have
9   supervisors among the flaggers?
10      A   We have individuals in the company that go
11   out and check on jobs.
12      Q   Okay.  What I'm asking is among the
13   flaggers are there -- are there flaggers or traffic
14   controllers whose job is to be a supervisor of the
15   flaggers while contemporaneously being a flagger as
16   well?
17      A   Well, we do put -- on each crew there is
18   two individuals on a crew.  One person is going to
19   be responsible for driving the truck and the
20   paperwork.  They get the extra hour to go back and
21   forth; a half hour there and a half hour back.  If
22   you want to consider that a supervisor, I guess so.
…

29:20      Q   How is the supervisor's job any different
21   than the other flaggers's job other than filling in
22   the paperwork and driving the truck to and from the
30:1   work location?
2      A   Typically, that person is the person
3   that's going to be senior on the crew who really
4   knows what's going on.  We usually try to put
5   somebody that's been out there, done it quite a
6   while with somebody that hasn't done it quite a
7   while.  So, but pretty much those guys, when people

                        6

8   come into the system, if a guy is running a crew,
9   say he is working with let's say Randolph, he is
10   working with Chester Brown, he gets to pick, he gets
11   to pick who he wants working with him, within
12   reason.
13        MR. BOHN:  He being who?  Chester Brown
14   gets to pick or Randolph gets to pick?
15        THE WITNESS:  Randolph gets to pick.
16   Because we get a lot of guys that come and go.  So
17   some are lazy, some they pass the ATSSA test, but
18   when they get out there they just don't know and
19   seem to get it.  So guys like Randolph will come to
20   us and say, hey, this guys is not working out for
21   me, I want a replacement.  So, yeah.  That would be
22   the supervisor then.
…

33:22        Q    Just for the purpose of asking this
34:1   question I want you to assume that PEPCO says we are
2   going to start this job at 9 o'clock and end it at
3   5:00.  For that eight hours where the flaggers are
4   needed, do the supervisor and the person, the less
5   senior person, do they have any different job duties
6   and responsibilities?
7        MR. BOHN:  And I'm just going to object to
8   the form of the question.  Calls for speculation.
9   But you can answer.
10   BY MR. WOODFIELD:
11        Q    If you know.  Do they do anything
12   different?
13        A    I mean, we are really not out on those job
14   sites.  Like I said, the contractor controls those
15   job sites.  If he is having them guys do something
16   else, that's on the contractor.  We send those guys
17   out there to do traffic control and they have to
18   work in conjunction with each other.  One guy is
19   more senior because he knows better, but you have
20   got a lot of crews where both guys know exactly what
21   they are doing so they work in tandem with each
22   other.
35:1        Q    To make sure I understand, and this is
2   what I assume flaggers do, you have got say a street
3   being, some power lines running alongside parallel
4   to the street, and you have a flagger at one end and
5   a flagger at the other, and one says slow and the
6   other says stop so they control the traffic going

7

> 7   back and forth; is that correct?
> 8       A    That's correct.
> 9       Q    And they, through either a walkie-talkie
> 10  or a cell phone, communicate with each other so they
> 11  coordinate the traffic flow going back and forth; is
> 12  that right?
> 13      A    Correct.
> **14      Q    And so during the course of doing that**
> **15  work, are -- do they do anything different during**
> **16  the day or do they both essentially have the same**
> **17  job?**
> **18      A    They essentially have the same job.**

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 26:9-35:18 (emphasis added).

Moreover, PowerComm has employed all similarly situated flaggers as independent

contractors:

> 43:4      Q    Okay.  Let me ask you.  Have for the last,
> 5   we will say the last four years since the suit was
> 6   filed about six months ago, have in the past four
> 7   years all of the flaggers that have been working for
> 8   PowerComm been employed as independent contractors?
> 9       A    Yes.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 43:4-43:9.

During Plaintiffs' employment with PowerComm it regularly paid its flaggers straight

time for all hours they worked in excess of 40 hours a week.  Randolph Decl. at ¶ 5; Ex. 2,

PowerComm Rule 30(b)(6) Depo., 10/11/13, at 75:21-76:7.  PowerComm treats its flaggers as

independent contractors; however, it directs them how to do the work, when to show up for

work, where to show up for work, what to wear, and what their hours will be.  Randolph Decl. at

¶ 6.  For example, while flaggers can make hiring recommendations to PowerComm, flaggers are

not able to hire employees.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 31:8-32:16.

Further, PowerComm supplies its flaggers with all the equipment necessary for the job, flaggers

are only required to provide their own protective clothing:

36:3  Q   What type of vehicle do the flaggers
4  drive?
5     A   Pickup trucks.
6     Q   Is it like a big F250 or is it like a
7  Ranger?
8     A   No.  It's your typical Ford F150.
9     Q   And the F150, does it have any, any
10  special equipment on it such as, like hydraulic
11  equipment or is it just basically an open-back
12  pickup truck?
13     A   Just your regular standard pickup truck.
14     Q   Who provides the pickup truck to the
15  flaggers?
16     A   We do.
17     Q   That's a PowerComm vehicle?
18     A   PowerComm vehicle.
19     Q   Okay.  In terms of the flags, are the
20  flaggers supposed to supply their own?
21     A   They are not -- they cannot use flags.
22  They have to use paddles.
37:1     Q   Who supplies the paddles?
2     A   We supply the paddles.
3     Q   Are there road blocking implements like
4  saw horses or something that they use or cones?
5     A   Cones.
6     Q   Okay.  Who supplies the cones?
7     A   PowerComm.
8     Q   Other than the paddles and the cones and
9  the pickup truck, is there tape or anything else
10  that might be used on a standard job?
11     A   No.
12     Q   How do the traffic controllers or flaggers
13  communicate with each other?
14     A   Walkie-talkie.
15     Q   Who supplies the walkie-talkies?
16     A   We do.
17     Q   In terms of equipment that the flaggers
18  are supposed to supply, are they supposed to supply
19  their own hard hats?
20     A   All their own PPE, that's required by
21  them.  That's standard.  That's hard hats, glasses,
22  vests.  The class of vest and reflective gear that
38:1  they have to do depends on night and day.  Sometimes
2  it's full suits.  At nighttime they are required to
3  wear full suits.  And that's under ATSSA rules.  And
4  also steel-toed boots as well.

```
 5     Q   So, essentially, they are supposed to
 6  provide what they wear?
 7     A   Uh-huh.
 8     Q   Okay.  And the rest of the equipment that
 9  they use would be supplied by PowerComm?
10     A   That's correct.
```

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 36:3-38:10.

Sometimes PowerComm paid its flaggers as W2 employees, and sometimes it paid them

as 1099 independent contractors.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 70:10-

71:13.  PowerComm would then issue both a W2 and a 1099 tax form for the year in question.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 71:21-72:2.  PowerComm maintains that

although it was paying flaggers as W2 employees it never considered them an employee for

overtime compensation, maintaining that they were independent contractors:

```
 7     A.  We always considered him a 1099
 8     contractor. The purpose for this, he wanted taxes
 9     taken out. We still considered him a subcontractor.
10     I have never considered him an employee. And the
11     reason that it goes back and forth, because he is
12     the one that would pick and choose when he wanted to
13     be on payroll or he wanted to be a 1099. We let him
14     have it at his discretion, but it got to be to the
15     point where it started to be an accounting
16     nightmare, so --
17     Q   Did PowerComm provide that accommodation
18     for any other flaggers, that they could say just
19     take money out of my -- withhold money and treat me
20     as an employee at any times?
21     A   At that particular time, yes. Anybody
22     that wanted to have taxes taken out was allowed to.
73:1     Q   And then they would be paid on a W-2
 2  basis?
 3     A   Right.  Because we were under the
 4  assumption that W-2s, because there was no written
 5  employment agreement, that they were still
 6  considered 1099s.
```

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 72:7-73:3.

Moreover, PowerComm treats its flaggers like its regular employees.  For example, PowerComm requires that all flaggers consent to a drug test, a driving history check, and a criminal background check.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 96:20-97:7; 131:19-132:18; 120:17-121:19.  Additionally, PowerComm requires all of its flaggers to sign non-disparagement agreements, search consent forms, and right to work forms.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 126:19-128:11; 129:17-130:3.

## II.     Defendants failed to properly analyze whether Plaintiffs were properly classified as independent contractors.

Defendants' own employment manual extensively details the differences between independent contractors and employees, and it sets forth multiple factors to be considered and weighed when attempting to properly classify a position as that of an employee or an independent contractor.  Ex. 3, Employee Handbook re Independent Contractors at 111-119. The handbook enumerates and explains in detail, the various tests that can be used to analyze whether Plaintiffs were properly classified as independent contractors.  Ex. 3 at 113-119.

For example, Defendants' handbook outlines in detail the 20-factor test traditionally used by the IRS.  *Id.*  These factors include, instructions; training; integration; services rendered personally; hiring, supervising, and paying assistants; continuing relationship; set hours of work; full-time work required; working on employer's premises; required order or sequence of work; oral or written reports; payment of wages; payment of business and travel expenses; furnishing tools and materials; significant investment; realization of profit or loss; working for more than one firm at a time; making services available to the general public; right to discharge; and right to quit. *Id.* at 114-116.  The handbook provides a clear definition of each factor.  Additionally, the handbook explains, in detail, the 1996 IRS Guidelines, as well as the "safe harbor" provisions; and economic reality test.  *Id.* at 116-118.  Finally, the handbook explains, "because

11

the law in this area is complex and often unclear, employers with worker classification questions should consult a tax expert or local employment lawyer". *Id.* at 118.

Despite Defendants having this information at their fingertips, Defendants failed and/or refused to properly analyze if whether Plaintiffs' classification as independent contractors was proper. In fact, Defendants disregarded all of the instruction set forth in their own manual and instead exclusively considered its own factors when it considered whether to classify Plaintiffs as independent contractors:

> 43:10  Q    How was the decision made to employ them
> 43:11  as independent contractors rather than employees?
> 43:12     A    Because the right of control.  We have no
> 43:13  control over what the contractors want us to do with
> 43:14  the flaggers.  They dictate where they go, when they
> 43:15  go, their time.  It makes it impossible to manage it
> 43:16  as, manage them as employees, and the work is not
> 43:17  guaranteed whatsoever.  So we made the determination
> 43:18  that they were going to be independent contractors.
> …
> 49:21     Q    Okay.  Is that the extent of the analysis
> 22  that you considered in terms of what classification
> 50:1  you were going to give to the flaggers as either
>  2  being independent contractors or employees?
>  3     A    It was a huge factor.
>  4     Q    Were there any other factors?
>  5     A    The training part of it.  We did not want
>  6  to -- we are not a flagging company.  That's not
>  7  what we do.  So ATSSA requires that they go through
>  8  their training program.  So you have to get a
>  9  flagging instructor, a flagging company that's going
> 10  to actually train these guys.  And we are not in the
> 11  business of traffic control.  We do this for PEPCO
> 12  and that's it.
> 13        So I'm not going to go through all the
> 14  bells and whistles and set up a whole organization
> 15  with ATSSA to, you know, to get these guys through
> 16  school, run them through it for something that is
> 17  not part of our business.  I mean we just -- this is
> 18  not our core, this is a contract that we do for
> 19  PEPCO, we do not offer it to any of our other
> 20  clients, nor will we ever offer it to any of our

```
21   other clients and that's the bottom line.
22       Q    Were there any other factors other -- that
51:1   were employed by PowerComm in the determination of
 2    whether the, whether the flaggers would be
 3    independent contractors or employees other than the
 4    training issue in terms of certifying them as
 5    flaggers and the fact that PowerComm had no control
 6    over what hours or locations the subcontractors
 7    might send the flaggers to?
 8       A    Equipment was a big factor.  We make them
 9    buy their own PPE for the simple fact is that a lot
10   of times stuff comes missing, stealing.
11       Q    When you say PPE, what's PPE?
12       A    Personal protective gear.  That's the hard
13   hats and everything else.  We didn't want to get in
14   the business of supplying those guys with all their
15   hard hats and glasses and boots and whatever have
16   you.  And then, you know, it's just, you know, we
17   are not -- just not in that business as well.  They
18   have to supply their own stuff.  So we didn't want
19   to get -- I didn't want a whole warehouse full of
20   equipment just dedicated to those guys.  It's not
21   commonsensical.
22       Q    Were there any other factors that you all
52:1   considered other than the personal protective gear,
 2    the training, and the control that the
 3    subcontractors might have over the work locations
 4    and the hours?
 5       A    That was pretty much it.
```

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 43:10-18; 49:21-52:1.

Defendants did not consult their attorney regarding the proper classification of Plaintiffs until five years after Defendants decided to classify flaggers as independent contractors.  Ex. 4, Geoffrey Bohn Deposition, at 16:18-18:13.  In fact, by their own admission Defendants first consulted their attorney about the issue of whether they properly classified the flagger position as an independent contractor for the first time within the two months preceding the filing of this lawsuit (the complaint in this matter was filed on June 12, 2013, Case 8:13-cv-01696-PWG Document 1 Filed 06/12/13):

46:20     Q   Prior to speaking with Mr. Bohn, did you
46:21  classify the flaggers as either employees or
46:22  independent contractors?
47:1     A   Independent contractors.
47:2     Q   Okay.  And then were you concerned about
47:3  the classification such that you spoke to him?
47:4     A   No.  I was not concerned whatsoever.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 46:20-47:4.

9:10     Q    Okay.  While you were present during
11  Mr. Kwasnik's deposition, did you hear him testify on
12  subject matters involving your firm's advice to PowerComm
13  as to the independent contractor issue in dispute in the
14  Randolph matter?
15     A   Yes.
16     Q   Did you hear him testify to anything that you
17  thought was inaccurate?
18     A   No.
19     Q   As far as you can recall, was his testimony
20  accurate and complete?
21     A   Yes.  There was -- in looking at it, there was
22  one thing that I recall that I don't think he recalled,
10:1  and that was the timeline of stuff as we produced the
2  document that was dated April of -- before this lawsuit
3  was filed.
4         The genesis for kind of revisiting the whole
5  independent contractor analysis was that he had spoken
6  with his accountant, and his accountant had said that
7  these traffic controllers should be classified as
8  independent contractors.
…
12:14     Q    When did Mr. Kwasnik's accountant raise the
15  issue with Mr. Kwasnik, as far as you know, about whether
16  the independent contractor label was proper for the
17  flaggers in the Randolph matter?
18     A   Well, my recollection is it would have been
19  before the date of this communication, April 22nd, 2013.
20     Q   Okay.  Within a month or two before?
21     A   My recollection was that Mr. Kwasnik was in
22  discussions with his accountant related to preparing tax
13:1  returns.  Tax returns are typically filed on April 15th.
2  Other than that, I really can't recall if it was a month
3  or 2 months or 3 months.
4     Q   Would it be fair to say it was likely sometime
5  in 2013?

14

6    A   I would believe that it would be, but frankly,
7  I would be speculating.  I would think so, but I don't
8  have anything that could specifically tell me what date
9  that was.
10    Q   Okay.  Prior to Mr. Kwasnik -- and let me ask
11  you this:  Did Mr. Kwasnik, after speaking with his
12  accountant, approach you -- and by you, I mean -- let me
13  ask this more clearly.
14       Do you know if Mr. Kwasnik asked anyone other
15  than you at Bohn & Kouretas for legal advice as to the
16  proper classification of the individuals who are employed
17  as flaggers at PowerComm, as to whether they are properly
18  classified as independent contractors or employees?
19    A   I don't know if he did or not.
20    Q   Do you have any reason to believe that he
21  contacted Mr. Kouretas about this issue?
22    A   I don't believe so.
14:1    Q   Do you have any reason to believe that he
2  contacted Mr. Battey about the issue of whether they were
3  properly classified as employees or independent
4  contractors?
5    A   That I do not know.  It's conceivable.
6  They've had communications related to this case and
7  related to business aspects, but I don't specifically
8  know if Mr. Kwasnik called Mr. Battey related to this
9  issue.  And I would be speculating, but I would think
10  probably not.
11    Q   Let me make it perhaps simpler.  Were you the
12  primary contact person for PowerComm with regard to
13  getting advice on the issue of whether the people in
14  question were properly classified as independent
15  contractors or employees?
16    A   I believe so.
17    Q   And had you ever spoken to anyone at PowerComm
18  prior to 2013 about whether the employees -- or the
19  individuals who PowerComm used as flaggers were properly
20  classified as independent contractors or employees?
21    A   I don't believe so.
22    Q   Do you know if prior to 2013, January 1st,
15:1  2013, Mr. Kwasnik or anyone at PowerComm had received any
2  legal advice or instruction from anyone on the issue of
3  whether PowerComm was properly classifying individuals as
4  employees or independent contractors in the flagger
5  position?
6    A   Not to my knowledge.

Ex. 4, Bohn Deposition, at 9:10-15:6.

**III.     Defendants intentionally benefitted financially from misclassifying Plaintiffs as independent contractors.**

Defendants acknowledge that they purposefully misclassified Plaintiffs as independent contractors solely for the financial benefit it afforded Defendants.  For example, Defendants testified that it was considerably more expensive for Defendants to bid on contracts if the flaggers were classified as employees rather than independent contractors, so that's why they were classified as independent contractors.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 123:17-124:7.  Moreover, Defendants openly admit that they "cut corners" for the financial gain of the business:

> 87:17     Q    Has PowerComm provided paid leave to any
> 18   flaggers historically?
> 19      A   No.
> 20      Q    Has it provided FMLA leave to flaggers?
> 21      A   No.
> 22      Q    When -- so I think you answered this
> 88:1   already.  Has PowerComm ever had a 401(k) or other
>  2   retirement plan?
>  3      A   We had one back in 2000 and it just
>  4   didn't -- we ended up terminating it and it was only
>  5   a couple people on it.  That was even I think before
>  6   we got the flagging contract.  Actually, it was
>  7   before we got the flagging contract.  It just wasn't
>  8   cost effective.  ***We are a small company, we are***
>  9   ***trying to cut corners.***  It's difficult enough as it
>  10   is.  But I mean when you have to match, it just
>  11   doesn't work.  That's not to say we won't do it in
>  12   the future.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 87:17-88:12 (emphasis added).

As such Defendants failed to perform a proper analysis of Plaintiffs classification because Defendants were only concerned with their financial bottom line and not with ensuring compliance with the FLSA.

**IV. Defendants failed to produce discovery for 20 opt-in Plaintiffs**

In their instant Motion for Summary Judgment, Defendants' argue that the following

Opt-In Plaintiffs are time barred:

1. Andre Adams last worked for Defendants in 2010.

2. Fasil Alemayehu last worked for Defendants on February 1, 2011.

3. Dexter Anderson last worked for Defendants before 2010.

4. Michael ("William) Allen last worked for Defendants on March 9, 2011.

5. Johnny Boykin last worked for Defendants in 2010.

6. Ezra Calloway last worked for Defendants in 2010.

7. Van Eubanks last worked for Defendants in 2010.

8. Regina Freeman last worked for Defendants before 2010.

9. Samuel Hedgewood last worked for Defendants in 2010.

10. William Holland last worked for Defendants in 2010.

11. Robin Melton last worked for Defendants on February 22, 2011.

12. Alonzo Mudd last worked for Defendants in 2006.

13. David Peterson last worked for Defendants in 2009.

14. Leonard Pringle last worked for Defendants in 2009.

15. Jacqueline Ridley last worked for Defendants in 2010.

16. Raleigh Wall last worked for Defendants in 2009.

17. Robert Wall last worked for Defendants in 2006.

Def. Memo at 3.

In response to these allegations Plaintiffs submit the following facts:

1.      Plaintiffs do not have any evidence that Andre Adams worked within the time period in question.

2.      Fasil Alemayehu was employed by Defendants from in or about 2008 through in or about 2011.  Alemayehu regularly worked overtime.  Defendants paid Alemayehu $8.50 an hour.  Alemayehu estimates that he worked on average roughly 8.4 hours per week. Ex. 5, Alemayehu Interrogatory Responses at 5-6.

3.      Dexter Anderson was employed by Defendants from in or about 2003 through in or about 2011.  Anderson regularly worked overtime.  Defendants paid Anderson $12.00 an hour.  Anderson estimates that he worked on average 12.5 hours per week. Ex. 6, Anderson Interrogatory Responses at 5-6.

4.      Plaintiffs do not have any evidence that Michael ("William) Allen worked within the time period in question.

5.      Johnny Boykin was employed by Defendants from in or about December 2009 through in or about May 2011, and again from in or about April 2011 through in or about February 2013.  Boykin regularly worked overtime.  Defendants paid Boykin $11.00 an hour.  Boykin estimates that he worked on average roughly 2.5 hours per week.  Ex. 7, Boykin Interrogatory Responses at 5-6.

6.      Ezra Calloway was employed by Defendants from in or about May 2007 through in or about June 2011.  Calloway regularly worked overtime.  Defendants paid Calloway $9.00 an hour.  Calloway estimates that he worked on average roughly 8.4 hours per week.  Ex. 8, Calloway Interrogatory Responses at 5-6.

7.      Plaintiffs do not have any evidence that Van Eubanks worked within the time period in question.

8.      Plaintiffs do not have any evidence that Regina Freeman worked within the time period in question.

9.      Samuel Hegwood was employed by Defendants from in or about 2004 or 2005 through in or about 2012.  Hegwood regularly worked overtime.  Defendants paid Hegwood $13.00 an hour.  Hegwood estimates that he worked on average roughly 20 hours per week. Ex. 9, Hegwood Interrogatory Responses at 4-6.

10.     Plaintiffs do not have any evidence that William Holland worked within the time period in question.

11.     Robin Melton was employed by Defendants from in or about April 2003 through in or about November 2011.  Melton regularly worked overtime.  Defendants paid Melton $9.50 an hour when she first began her employment with Defendants but later earned $15.00 an hour and $17.50 an hour.  Melton estimates that she worked on average roughly 15 hours per week. Ex. 10, Melton Interrogatory Responses at 4-6.

12.     Alonzo Mudd was employed by Defendants from in or about April 1999 through in or about August 2004.  Mudd regularly worked overtime.  Defendants paid Mudd between $11.00 and $13.00 an hour.  Ex. 11, Mudd Interrogatory Responses at 4-6.

13.     Plaintiffs do not have any evidence that David Peterson worked within the time period in question.

14.     Leonard Pringle was employed by Defendants from in or about November 2005 through in or about 2011.  Pringle regularly worked overtime.  Defendants initially paid Pringle $10.00 an hour but later paid him $11.50 an hour.  Pringle estimates that he worked on average roughly 7.5 hours per week. Ex. 12, Pringle Interrogatory Responses at 4-6.

15.     Jacqueline Ridley was employed by Defendants from in or about 2008 through in or about 2009.  Ridley regularly worked overtime.  Defendants initially paid Ridley $8.50 an hour and then increased her pay to $15.00 an hour.  Ex. 13, Ridley Interrogatory Responses 4-6.

16.     Raleigh Wall was employed by Defendants from in or about August 2005 through in or about 2007.  Wall regularly worked overtime.  Defendants paid Wall between $11.00 and $13.00 an hour.  Ex. 14, Wall Interrogatory Responses at 4-6.

17.     Plaintiffs do not have any evidence that Robert Wall worked within the time period in question.

Moreover, Defendants failed and/or refused to produce any discovery for any of the foregoing 17 Plaintiffs, and Mr. Kwasnik subsequently claimed in PowerComm's second corporate representative deposition that the reason that such records were not produced was because Defendants believed that these individuals' claims were time barred and therefore Defendant had no obligation to produce any documents responsive to their requests:[3]

> 17:20    Q    Okay.  So there were 22 people -- there are
> 17:21  22 plaintiffs who received no documents, correct?
> 17:22    A    Correct.
> 18:1    Q    And is it your testimony those 22 people
> 18:2  never worked for PowerComm?
> 18:3    A    They were time barred.
> 18:4    Q    So you made the decision not to produce any
> 18:5  discovery for those people?
> 18:6    A    It's my understanding of the law that 3
> 18:7  years prior -- they can go back 3 years, right.
> 18:8  Prior to the 3 years, say 4 years, 5 years, right,
> 18:9  they're not entitled to be in this lawsuit.  They're
> 18:10  time barred from it.
> 18:11    Q    So even though there was a discovery
> 18:12  request for the time records for these people, is
> 18:13  PowerComm saying it has time records for those
> 18:14  people and it did not produce them because it takes
> 18:15  the --

---

[3] Plaintiffs acknowledge that there are three individuals whose claims appear to be time barred.

18:16    A   I'm just telling you that they're just time
18:17  barred -- my understanding of the law is that
18:18  they're time barred.
18:19    Q   So my question is, do you have records for
18:20  the 22 people you did not produce -- that you did
18:21  not produce because you think those people's claims
18:22  are time barred?
19:1    A   We didn't actually look into them because
19:2  it's our understanding of the law that they're time
19:3  barred, so we --
19:4    Q   So you didn't even look for the discovery
19:5  for those people; is that correct?
19:6    A   That's my understanding that they are time
19:7  barred.
19:8    Q   So you didn't look for the documents for
19:9  those people?
19:10    A   On that -- all I'm saying is that we went
19:11  through a lot of documents.  We concentrated on the
19:12  people that were not time barred, and we didn't
19:13  concentrate on the people that –

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14 at 17:20-19:13.

However, this testimony cannot be reconciled with Mr. Kwasnik's prior testimony as

PowerComm's corporate representative wherein he testified that:

112:22    Q   Does PowerComm keep a record of the number
113:1  of hours its employees worked for the last three
2  years?
3    A   Our employees we do, because we do it
4  through the payroll system.  Our independent
5  contractors, no.
6    Q   You don't keep any records of their time
7  worked other than --
8    A    Just if we have these.  Because once
9  again, under independent contractor status, we
10  weren't required, we weren't required to keep those
11  records.  There was no need to.  It just takes up
12  space.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 112:22-12.   Likewise it cannot be

reconciled with Mr. Kwasnik's prior testimony as PowerComm's corporate representative

wherein he testified that:

21

> 6:22   Q   Okay.  Very briefly, there was a deposition
> 7:1   previously on October 11th, 2013.  Is everything
> 2   that you said in there still true and correct?
> 3     A   I don't remember the whole entire
> 4   deposition, but as far as I know, yes.

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14, at 6:22-7:4.  When asked about this

conflict, Mr. Kwasnik simply declared:

> 22:16   Q   So are you saying that when you testified
> 17   previously in your first deposition you were wrong?
> 18     A   I was wrong.  I didn't realize that they
> 19   existed, and at that particular time, I didn't
> 20   realize that they existed, but we weren't digging it
> 21   into either for the simple fact you have two
> 22   plaintiffs.  You have Randolph and you have Dana
> 23:1   Brown.
> 2     Q   Would you agree with me that your testimony
> 3   today is entirely different than in your first
> 4   deposition?
> 5     A   At the time when I testified, that was my
> 6   recollection of the truth.
> 7     Q   Okay.  And your recollection of the truth
> 8   today is different?
> 9     A   The evidence speaks for itself.

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14, at 22:16-23:9.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

genuine issue is said to exist if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party," and a material fact is one "that might affect the outcome of the suit

under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In

making the determination on summary judgment all reasonable inferences from the evidence

must be drawn in favor of the nonmoving party, and the facts must be viewed in the light most

favorable to him.  *Id.* at 252, 55.

# ARGUMENT

## IX.     Defendants are "Employers" and Plaintiffs are "Employees" under the FLSA.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  Further, the Act "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) (quoting 29 U.S.C. § 203(g)).  In fact, the Supreme Court has characterized the FLSA's definition of "employee" as "the broadest definition that has ever been included in any one act."  *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945).  Moreover, the FLSA contemplates that when there are several simultaneous employers, each is responsible for compliance with the Act.  *See Falk v. Brennan*, 414 U.S. 190, 195 (1973); *see also* 29 C.F.R. § 791.2(a).

The Fourth Circuit addressed the issue of who is properly an employer under the FLSA in its decision in *Schultz v. Capital International Security, Inc.*, 466 F.3d 298 (4th Cir. 2006).  In *Schultz*, the Fourth Circuit clearly laid out the analysis that should be followed in cases where there is any question as to whether an employment relationship exists under the FLSA:

> An employee is defined as "any individual employed by an employer," *id.* § 203(e)(1), and an "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* § 203(d).  In addition, the Act "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (quoting 29 U.S.C. § 203(g)). These definitions broaden "the meaning of 'employee' to cover some [workers] who might not qualify as such under a strict application of traditional agency [or contract] law principles."  *Id.*  In determining whether a worker is an employee covered by the FLSA, a court considers the "economic realities" of the relationship between the worker and the putative employer.  *Henderson v. Inter-Chem Coal Co.,* 41 F.3d 567, 570 (10th Cir. 1994) (citing *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947)).  The focal point is whether the worker "is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself."  *Id.* (internal quotation marks and alteration omitted); *see also Martin v. Selker Bros., Inc.,* 949 F.2d 1286, 1293 (3d Cir. 1991); *Brock v.*

23

*Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988); *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1311 (5th Cir. 1976).

The emphasis on economic reality has led courts to develop and apply a six-factor test to determine whether a worker is an employee or an independent contractor.  The factors are (1) the degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business.  *Herman v. Mid-Atlantic Installation Servs., Inc.,* 164 F.Supp.2d 667, 671 (D.Md. 2000); *see also Henderson,* 41 F.3d at 570.  (These factors are often called the "*Silk* factors" in reference to *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), the Supreme Court case from which they derive.)  No single factor is dispositive; again, the test is designed to capture the economic realities of the relationship between the worker and the putative employer.  *Henderson,* 41 F.3d at 570.

*Schultz*, 466 F.3d at 304-305.

Defendants meet the definition of an "employer" under the FLSA.  As mentioned *supra*, the FLSA defines "employer" expansively to include "any person acting directly or indirectly in the interest of an employer in relation to any employee." 29 U.S.C. § 203(d).  The term "person" is also broadly defined by the statute to include an "individual." *Id.* at § 203(a).  Given the broadness of this definition, courts have undisputedly held that an employee may have more than one "employer" under the FLSA.  *Falk*, 414 U.S. at 195.  Moreover, "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983).

The facts in this matter are very similar to those in *Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190-91 (S.D.N.Y. 2003).  In *Ansoumana*, workers hired by contractors of supermarket and drugstore corporations to work as delivery personnel in corporations' stores brought class action against corporations, contractors, and individuals,

24

alleging violation of Fair Labor Standards Act (FLSA) and state minimum wage statute. The

district court granted class certification and created subclasses.  When confronted with the

workers' motion for summary judgment against drugstore corporation and one of the contractors

on question of liability, the district court held that the delivery workers were "employees" of the

contractor for purposes of statutes in question and that the contractor's individual owners also

qualified as "employers."  Specifically, the *Ansoumana* Court noted that:

> The Hudson/Chelsea defendants' relationship with plaintiffs satisfies the first of the
> *Brock* considerations, showing a substantial degree of control over the workers. As *Brock*
> made clear, "[a]n employer does not need to look over his workers' shoulders every day
> in order to exercise control." 840 F.2d at 1060; *Herman v. RSR Sec. Servs.,* 172 F.3d 132,
> 140 (2d Cir.1999) (finding the first *Brock* factor satisfied where putative employer hired
> employees and "on occasion, supervised and controlled employee work schedules and the
> conditions of employment"); *Thomas v. City of Hudson,* No. 95–CV–0070, 1996 WL
> 280828, at *6–*7, 1996 U.S. Dist. LEXIS 7244, at *17–*21 (N.D.N.Y. May 18, 1996);
> *see also Goldberg v. Whitaker House Co-op.,* 366 U.S. 28, 32–33, 81 S.Ct. 933, 6
> L.Ed.2d 100 (1961) (finding homeworkers "employees" where putative employer had
> power to hire and fire them); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir.1946)
> (finding tailors, who occasionally did jobs for more than one employer and hired
> employees to work for them, employees rather than independent contractors). The fact
> that the Hudson/Chelsea defendants hired, fired, transferred and paid the delivery
> workers weighs substantially in favor of finding an employment relationship between the
> Hudson/Chelsea defendants and plaintiffs.

*Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 190-91 (S.D.N.Y. 2003).

Defendants exercised significant control over Plaintiffs' employment, determining when

and where he worked and for how long, as well as what he was required to wear.  In Judge

Grimm's March 3, 2014 Order Denying Defendants' Motions for Summary Judgment and

granting Plaintiffs' Motion for Notice, Judge Grimm finds, "it readily apparent that PowerComm

was paying Plaintiffs' wages…and therefore is Plaintiffs' employer".  Case 8:13-cv-01696-PWG

Document 50 Filed 03/26/14 Page 17.  Defendants have not meaningfully contested that this

factor.  Moreover, PowerComm paid Plaintiffs and had the authority to terminate their

employment.  *See* Ex. 1 at ¶ 21.  Plaintiffs did not invest in any equipment or materials, nor did

they have any of their own employees, and as such they did not have opportunity for profit or loss dependent on their managerial skills.  Ex. 1 at ¶ 9.  Further, Plaintiffs use the vehicle and flagging equipment provided to them by Defendants, and their only investment was their own clothing.  *Id.* at ¶ 9, 12.  Finally, as a flagger, Plaintiffs were an integral part of Defendants' business, as Defendants need flaggers to ensure that traffic is being safely routed around its construction sites.  Ex. 1 at ¶ 2.  Judge Grimm explains that, "Plaintiffs likely are employees and not independent contractor."  Case 8:13-cv-01696-PWG Document 50 Filed 03/26/14 Page 25.  Additionally, Judge Grimm writes, "After reviewing all the *Silk* factors, it is apparent that a reasonable jury could find that Plaintiffs were employees and not independent contractors."  *Id.* at 16.  Therefore, as the Plaintiffs' employment satisfies all of the *Silk* factors, Defendants incorrectly classified Plaintiffs as independent contractors, making them employees under the FLSA.

**X.     Defendants did not act in good faith when it misclassified Plaintiffs as independent contractors.**

To satisfy the good faith requirement, an employer must have acted in good faith, having reasonable grounds for believing that he was not acting in violation of the FLSA.  29 U.S.C. § 260.  Defendants have the burden to prove that they acted in good faith, as liquidated damages are presumed.  *Id.* (Emphasis added).  "If the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages."  *Id.* In *Trans World Airlines, Inc. v. Thurston*, the court found that although defendant's policy violated the ADEA, the defendant acted in good faith in its attempt to determine if their policy violated the Act.  469 U.S. 111, 113 (1985).  Contrastingly, in this matter Defendants made no

valid, timely effort to determine if Plaintiffs were properly classified as independent contractors

so as to not violate the FLSA, and instead acknowledge that the primary consideration for the

classification was the cost to Defendants.

A. *Defendants own policy manual details the difference between independent contractors and employees and put Defendants on notice of their misclassification of Plaintiffs.*

Defendants have knowledge of the Fair Labor Standards Act and its requirements. Their

own policies, which were produced in discovery, detail the differences between independent

contractors and employees. Ex. 3 at 114. Defendants' policy manual enumerates and explains in

detail, various tests that can be used to analyze whether Plaintiffs were properly classified as

independent contractors.

> The main difference between an employee and an independent contractor is the amount of control the employer can exercise over the details of the work. For example, a person hired to program a computer is probably an employee if that person:
>
> - is required to appear in the employer's office at a certain time and work a certain number of hours each day;
> - is required to report regularly on the work performed; and
> - uses equipment and software belonging to the employer.
>
> In contrast, the same person could be considered an independent contractor if he or she:
>
> - controls the hours he or she works;
> - provides the software and equipment; and
> - reports only on major developments of the work.

*Id.* at 112.

Looking at the factors provided in this first test from Defendants' *own* policy manual,

Plaintiffs are incorrectly classified as independent contractors. For example, Plaintiffs are

required to arrive at the PEPCO yard at 7:00 am each morning. Ex. 1 at ¶ 10. Additionally,

Plaintiffs must report for work every day. *Id.* at ¶ 8. In his Order Denying Defendants' Motions

for Summary Judgment, Judge Grimm points out, "Plaintiffs…claim that their hours were controlled by PowerComm alone (or PowerComm's subcontractors), and that they were not free to see out other work….*This factor weighs in Plaintiffs' favor*." Case 8:13-cv-01696-PWG Document 50 Filed 03/26/14 Page 14 (emphasis added).  Finally, the equipment used by Plaintiffs is provided by Defendants.  Plaintiffs were required to provide their own personal protective equipment, which included boots, reflective clothing, hard hats, and eye and ear protection.  Ex. 1 at ¶ 9.  However, this cannot be considered equipment.  "the 'protective equipment' supplied by Plaintiffs included 'reflective clothing, steel toe boots, hard hats, safety vest, eye and ear protection….that is to say, much like any clerical employee, Plaintiffs were required to show up to work clothed in a manner appropriate for their work.  *This factor favors Plaintiffs*."  Case 8:13-cv-01696-PWG Document 50 Filed 03/26/14 Page 14 (emphasis added).

The policy manual also outlines the 20-factor test which is traditionally used by the IRS. Ex. 3 at 114.  These factors include, instructions; training; integration; services rendered personally; hiring, supervising, and paying assistants; continuing relationship; set hours of work; full-time work required; working on employer's premises; required order or sequence of work; oral or written reports; payment of wages; payment of business and travel expenses; furnishing tools and materials; significant investment; realization of profit or loss; working for more than one firm at a time; making services available to the general public; right to discharge; and right to quit.  *Id.* at 114-116.  The handbook provides a clear definition of each factor.  Additionally, the handbook explains, in detail, the 1996 IRS Guidelines, as well as the "safe harbor" provisions; and economic reality test.  *Id.* at 116-118.  Finally, the handbook explains, "because the law in this area is complex and often unclear, employers with worker classification questions should consult a tax expert or local employment lawyer".  *Id.* at 118.

Defendants failed to perform any reasonable analysis, let alone a good faith analysis, of Plaintiffs' classification under the various tests from their handbook.  Rather, Defendants claim that the decision to classify Plaintiffs as independent contractors was done by exclusively considering right of control.

> 43:10   Q   How was the decision made to employ them
> 43:11  as independent contractors rather than employees?
> 43:12     A   Because the right of control.  We have no
> 43:13  control over what the contractors want us to do with
> 43:14  the flaggers.  They dictate where they go, when they
> 43:15  go, their time.  It makes it impossible to manage it
> 43:16  as, manage them as employees, and the work is not
> 43:17  guaranteed whatsoever.  So we made the determination
> 43:18  that they were going to be independent contractors.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 43:10-43:18.

In contrast, however, Judge Grimm determined that Defendants exercised considerable control over Plaintiffs' work.  Case 8:13-cv-01696-PWG Document 50 Filed 03/26/14 Page 13. Additionally, Defendants failed to apply any of the tests enumerated in the handbook to determine if Plaintiffs were properly classified as independent contractors.

> B. *Defendants never attempted to ensure that Plaintiffs were properly classified.*

Defendants classified Plaintiffs as independent contractors without consulting with their attorney, as recommended by their own handbook.  It was not until April 2013, five years after Defendants had been classifying flaggers as independent contractors that they decided to consult their attorney.

> 46:20     Q   Prior to speaking with Mr. Bohn, did you
> 46:21  classify the flaggers as either employees or
> 46:22  independent contractors?
> 47:1     A   Independent contractors.
> 47:2     Q   Okay.  And then were you concerned about
> 47:3  the classification such that you spoke to him?
> 47:4     A   No.  I was not concerned whatsoever.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 46:20-47:4.

In fact, it was not until April 2013, that Defendants consulted with their attorney

regarding the independent contractor classification or an analysis regarding proper classification

was even performed.

16:18     Q    You would agree with me that PowerComm was
16:19  treating Mr. Randolph, at least for payroll tax purposes,
16:20  as an employee of PowerComm Construction, Inc.  Correct?
16:21     A    No.  Well, I would agree that Mr. Randolph was
16:22  issued a W-2, but, you know, you're -- call it a question
17:1  related to taxes.  I'm not a tax lawyer.  That would be a
17:2  question for his accountant.
17:3          I mean, the document speaks for itself.
17:4  Randolph was issued W-2s, he was issued 1099s.
17:5  Mr. Kwasnik was, I think, fairly explicit in his
17:6  testimony that he didn't consider the issuance of a W-2
17:7  to a traffic controller to mean that they were employees
17:8  as opposed to independent contractors.
17:9     Q    At any time did you ever advise Mr. Kwasnik or
17:10  PowerComm on the issue of whether issuing an employee a
17:11  W-2 and withholding taxes on behalf of that individual is
17:12  a representation to the federal government that the
17:13  individual is an employee of the entity issuing the W-2?
17:14     A    Our discussion related to classification
17:15  revolved around the analysis undertaken by the courts in
17:16  determining whether or not a person is an employee or
17:17  independent contractor.
17:18          Issues as you're talking about, tax, I refer
17:19  all tax issues that my clients have to tax attorneys.  We
17:20  don't offer tax advice.  That would have to be a question
17:21  that he would have to ask his accountant.
17:22     Q    Did you ever perform any written analysis as
18:1  to whether Mr. Randolph or any of the other flaggers
18:2  employed by PowerComm met any of the 21-factor test
18:3  issued by the IRS as to whether individuals are employees
18:4  or independent contractors?
18:5     A    The written analyses that were performed were
18:6  reflected in written filings that we made to the Court in
18:7  this case.
**18:8     Q    Okay.  Separate and apart from the written**
**18:9  filings in this matter, have you performed any other**
**18:10  written analyses as to whether the individuals that are**
**18:11  plaintiffs in the Randolph matter were properly**

> **18:12   classified as independent contractors or employees?**
> **18:13      A    No.**

Ex. 4, Bohn Depo. at 16:18-18:13 (emphasis added).

In fact, Defendants only received one communication from their attorneys regarding

Plaintiffs' independent contractor status.  Ex. 16, April 2013 Bohn Email.  This communication

does not provide any analysis as to whether Plaintiffs were properly classified, but rather only

provides Defendants with forms related to hiring independent contractors.  *Id.*

> **C.  *Defendants classified Plaintiffs as independent contractors for financial
> benefit.***

Defendants classified Plaintiffs as independent contractors for the financial benefits it

afforded Defendants.  It would be considerably more expensive for Defendants to bid on

contracts if they represented that their workers were employees and not independent contractors.

> 123:17      Q    But you don't have to pay unemployment on
> 18   a 1099; is that correct?
> 19      A    That's correct.
> 20      Q    You don't have to pay Social Security
> 21   contributions, the employer contribution on that; is
> 22   that correct?
> 124:1      A    That's correct.
> 2      Q    And FICA?
> 3      A    That's correct.  But having said that,
> 4   when we bid this contract, we bid it under the
> 5   premise of 1099s, so none of that was factored in.
> 6   So if that was to be factored in, the price per unit
> 7   would go up tremendously.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 123:17-124:7.

If Defendants were to bid on contracts with properly classified employees, they would

likely not be awarded these contracts because their bid numbers would be too high.  Another

financial benefit Defendants enjoy from classifying Plaintiffs as independent contractors is that

they are not required to pay benefits to Plaintiffs.  *Id.*

Most importantly, Defendants acknowledge that they classify Plaintiffs as independent

contractors as a means to "cut corners" for financial gain.

> 87:17    Q    Has PowerComm provided paid leave to any
> 18   flaggers historically?
> 19      A   No.
> 20      Q   Has it provided FMLA leave to flaggers?
> 21      A   No.
> 22      Q   When -- so I think you answered this
> 88:1   already.  Has PowerComm ever had a 401(k) or other
> 2   retirement plan?
> 3      A   We had one back in 2000 and it just
> 4   didn't -- we ended up terminating it and it was only
> 5   a couple people on it.  That was even I think before
> 6   we got the flagging contract.  Actually, it was
> 7   before we got the flagging contract.  It just wasn't
> 8   cost effective.  ***We are a small company, we are***
> 9   ***trying to cut corners.***  It's difficult enough as it
> 10   is.  But I mean when you have to match, it just
> 11   doesn't work.  That's not to say we won't do it in
> 12   the future.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 87:17-88:12, emphasis added.

Additionally, Defendants' counsel, Geoffrey Bohn, testified in his deposition that

Defendants were concerned that with the creation of Obamacare, it would be more expensive to

have the Plaintiffs be employees of PowerComm rather than independent contractors.  Ex. 4,

Bohn Depo. at 30:1-21.

Defendants were seeking personal financial gain when they misclassified Plaintiffs as

independent contractors.  Defendants failed to perform any requisite analysis either themselves

with the information located in their own handbook or through their attorney.  Defendants

possessed the tools necessary to properly classify Plaintiffs.  However Defendants decided to

knowingly forego these tools in making the decision to classify Plaintiffs as independent contractors, demonstrating that Defendants did not act in good faith.

### XI.    Defendants' actions demonstrate a reckless disregard for the FLSA and are therefore willful.

The Supreme Court held in *McLaughlin v. Richland Shoe Co.* that an employer's violations of the FLSA are willful if the "employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  486 U.S. 128, 134 (1988).  The violation cannot be a mere oversight or mistake, but rather a disregard for the law.  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 130 (1985).  In *Trans World Airlines*, the defendant inadvertently violated the ADEA with its retirement policy.  *Id.* at 120.  The court found that the defendant had not acted in reckless disregard for the statute because it sought out legal advice and consulted with the union.  *Id.* at 130.  The court therefore found that the defendant's ADEA violation was not done willfully.  *Id.*

Unlike *Trans World Airlines*, Defendants in the instant matter did not consult their attorney when determining that Plaintiffs should be classified as independent contractors.  Ex. 4, Bohn Depo. at 16:18-18:13.  In fact, Defendants did not consult their attorneys on the matter until only a few months before this matter was filed, which was four years after Defendants created the classification.  Ex. 16; Ex. 2, PowerComm 30(b)(6) Depo., 10/11/13 at 46:20-47:4.  Further, when Defendants finally did consult their attorney, no analysis was done as to whether Plaintiffs were properly classified, rather Defendants' attorneys never performed a written analysis of Plaintiffs classifications. Ex. 4, Bohn Depo. at 17:22-18:13.

As discussed, *supra*, Defendants classified Plaintiffs as independent contractors for personal financial benefit.  The Plaintiffs were labeled as independent contractors to lower bid amounts to ensure contract award, prevent Defendants from having to pay out benefits, and as a

means for Defendants to cut corners.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 87:17-88:12, 123:17-124:7; Ex. 4 at 30:1-21.

Moreover, Defendants regularly switched between paying Plaintiffs with 1099s and W2s tax forms.  Ex. 1 at ¶ 14; Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13 at 70:15-71:15. However, Defendants admitted that it was their preference to pay Plaintiffs as 1099 independent contractors because it was less expensive for Defendants as they did not have to pay time and a half for overtime or withhold taxes.  Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 71:21-17, 75:16-76:22.

Even with the financial implications and benefits of Defendants' decision to classify Plaintiffs as independent contractors, Defendants did not consult an accountant until 2013; five years after Defendants implemented this classification.  Ex. 4, Bohn Depo. at 12:14-13:9. Defendants failed to consult both their attorneys and accountants demonstrating reckless disregard for ensuring compliance with the FLSA.

## XII.   Defendants failed to properly maintain time records and therefore fail to prove that 17 Opt-In Plaintiffs are time-barred.

In *Anderson v. Mt. Clemens Pottery Co.*, the Supreme Court articulated the following standard:

> In such a situation an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

328 U.S. 680, 687-88 (1946).

Additionally, in *MacGregor v. Farmers* the court explained that in the absence of records

from the employer, an estimate of the average amount of overtime hours worked and weeks

worked satisfies an employee's burden.

> What quantum of evidence satisfies the just and reasonable inference standard is a matter
> of some debate. In *Randolph v. PowerComm Construction, Inc.*, ⸺ F.Supp.2d ⸺,
> 2014 WL 1260722 at * 10–11 (D.Md.2014), the district court found that plaintiffs' sworn
> declarations—which estimated the average amount of off-the-clock overtime hours
> worked each week as well as the number of weeks worked—met their burden of showing
> the amount of overtime worked by a just and reasonable inference. The Randolph court
> denied the defendant's motion for summary judgment because "[w]hether Plaintiffs have
> been compensated for every hour of overtime worked remains a subject of dispute." *Id.* at
> *11. In *McLaughlin v. Murphy*, 436 F.Supp.2d 732, 738 (D.Md.2005), on the other hand,
> the district court found that a plaintiff had not met his burden by estimating in an
> interrogatory response that he worked from 40 to 55 hours per week. *See also Lee v.
> Vance Exec. Protection, Inc.*,7 F. App'x 160, 166 (4th Cir.2001) (affirming summary
> judgment in favor of employer on an FLSA unrecorded overtime claim because while
> "[t]here is much general testimony about [uncompensated overtime work done by the
> plaintiffs], ... the record is bereft of evidence showing the amount or extent of this extra
> work").

> In this case, Cantrell, Carnahan and MacGregor have each averred that they worked "at
> least ten overtime hours each week" for which they were not compensated. Cantrell Decl.
> ¶ 12, Feb. 20, 2011; Carnahan Decl. ¶ 13, Feb. 14, 2011; MacGregor Decl. ¶ 13, Feb. 15,
> 2011. They stood by these estimates in their depositions.2 Hodges, the opt-in plaintiff,
> has estimated that he worked two to five off-the-clock overtime hours each week. Hodges
> Dep. 221:19–24, Sep. 23, 2013. Though their estimates do not include the total number of
> weeks of overtime worked, the court could determine those numbers through a close
> reading of the record.

> While plaintiffs' estimates are by no means detailed, the court—when drawing all
> inferences in their favor—finds that they have proven the amount and extent of their
> alleged overtime work as a matter of just and reasonable inference.

*MacGregor v. Farmers Ins. Exch.*, 2014 WL 4199140, at *4 (D.S.C. Aug. 20, 2014).

Defendants have moved for summary judgment for 17 individual Opt-In Plaintiffs,

asserting their claims are time barred.  Def. Memo at 14.  However, this should be denied as

Defendants have failed to provide Plaintiffs with any documents to confirm the years in which

these Plaintiffs worked.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)(finding

that plaintiffs must present affirmative evidence to defeat a motion for summary judgment as

long as plaintiffs have been given the full opportunity to conduct discovery).  Rather, Defendants

point to the absence of records to bolster their position.  Def. Memo. at 4.

David Kwasnik testified as PowerComm's Rule 30(b)(6) corporate representative that

Defendants did not retain time and attendance records for their flaggers:

> 112:22    Q    Does PowerComm keep a record of the number
> 113:1   of hours its employees worked for the last three
> 2   years?
> 3      A    Our employees we do, because we do it
> 4   through the payroll system.  Our independent
> 5   contractors, no.
> 6      Q    You don't keep any records of their time
> 7   worked other than --
> 8      A    Just if we have these.  Because once
> 9   again, under independent contractor status, we
> 10   weren't required, we weren't required to keep those
> 11   records.  There was no need to.  It just takes up
> 12   space.
> …
>
> 136:11     Q    What I'm asking about is essentially in
> 12   Exhibit 14, which is the PEPCO flagging paysheets,
> 13   obviously, you may or may not find any more PEPCO
> 14   flagging paysheets for Ms. Brown or Mr. Randolph.
> 15   Other than what you may produce for her and what you
> 16   produced for Mr. Randolph, do you have any other
> 17   records that would show some sort of accurate
> 18   portrayal of how many hours they worked during the
> 19   time they worked for PowerComm?
> 20      A    No.  It would only be on the time sheets
> 21   that are present right there.  That's the only
> 22   record that we have.  We are in the process of
> 137:1   digging through some old boxes to see if there is
> 2   anything there for you guys.
> 3      Q    Would that be the same for all of the
> 4   other employees, that they would be in the same
> 5   situation; that the way that we would be able to
> 6   determine the best records you have of how many
> 7   hours they would work or that they worked would be

8   the flagging paysheets that you have, and if you
9   don't have any, you don't have any records of how
10   many hours they worked?
11      A    That's correct.  Because like we said,
12   when it comes to employees, we rely on the payroll
13   service to keep track of it.  We are under the
14   premise that these guys are independent contractors,
15   so once the invoice is paid, typically we wait a
16   little while and then we purge it.

Ex. 2, PowerComm Rule 30(b)(6) Depo., 10/11/13, at 112:22-113:12, 136:11-137:16 (and

corresponding exhibit 14, attached hereto as Ex. 17).  When Defendants failed and/or refused to

produce any discovery for 17 Plaintiffs, they subsequently claimed that the reason that such

records were not produced was not because Defendants did not maintain them because they

threw them away, but now they assert that the individuals for whom they did not produce records

have claims that are time barred and therefore Defendant had no obligation to produce any

documents responsive to their claims:[4]

17:20   Q    Okay.  So there were 22 people -- there are
17:21  22 plaintiffs who received no documents, correct?
17:22      A    Correct.
18:1    Q    And is it your testimony those 22 people
18:2  never worked for PowerComm?
18:3      A    They were time barred.
18:4    Q    So you made the decision not to produce any
18:5  discovery for those people?
18:6      A    It's my understanding of the law that 3
18:7  years prior -- they can go back 3 years, right.
18:8  Prior to the 3 years, say 4 years, 5 years, right,
18:9  they're not entitled to be in this lawsuit.  They're
18:10  time barred from it.
18:11    Q    So even though there was a discovery
18:12  request for the time records for these people, is
18:13  PowerComm saying it has time records for those
18:14  people and it did not produce them because it takes
18:15  the --
18:16      A    I'm just telling you that they're just time
18:17  barred -- my understanding of the law is that

---

[4] Plaintiffs acknowledge that there are three individuals whose claims appear to be time barred.

18:18  they're time barred.
18:19    Q    So my question is, do you have records for
18:20  the 22 people you did not produce -- that you did
18:21  not produce because you think those people's claims
18:22  are time barred?
19:1    A    We didn't actually look into them because
19:2  it's our understanding of the law that they're time
19:3  barred, so we --
19:4    Q    So you didn't even look for the discovery
19:5  for those people; is that correct?
19:6    A    That's my understanding that they are time
19:7  barred.
19:8    Q    So you didn't look for the documents for
19:9  those people?
19:10    A    On that -- all I'm saying is that we went
19:11  through a lot of documents.  We concentrated on the
19:12  people that were not time barred, and we didn't
19:13  concentrate on the people that –

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14, at 17:20-19:13.

When asked why Defendants now claim to have produced all relevant records for all

employees in this matter, Mr. Kwasnik acknowledged that the evidence speaks for itself that

PowerComm has taken multiple, inconsistent positions with regard to whether it maintained and

produced complete employee time records for the plaintiffs in this matter:

22:1    Q    You said that they were kept by someone
2  who -- you didn't know they were being kept,
3  correct?
4    A    No, I didn't say that.
5    Q    So did you know they were being kept as a
6  record of --
7    A    If somebody in my office is filing them
8  away, I don't -- do you keep track of every person
9  in your office?  Do you keep track of what your
10  secretary does?
11    Q    Yes.
12    A    So you know everything she files and what
13  she throws away and what she doesn't?
14    Q    We do, yes.
15    A    You're a busy person then.
16    Q    So are you saying that when you testified
17  previously in your first deposition you were wrong?

> 18     A   I was wrong.  I didn't realize that they
> 19   existed, and at that particular time, I didn't
> 20   realize that they existed, but we weren't digging it
> 21   into either for the simple fact you have two
> 22   plaintiffs.  You have Randolph and you have Dana
> 23:1  Brown.
>  2     Q   Would you agree with me that your testimony
>  3   today is entirely different than in your first
>  4   deposition?
>  5     A   At the time when I testified, that was my
>  6   recollection of the truth.
>  7     Q   Okay.  And your recollection of the truth
>  8   today is different?
>  9     A   The evidence speaks for itself.

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14, at 22:1-23:9.

> 6:22   Q   Okay.  Very briefly, there was a deposition
> 7:1   previously on October 11th, 2013.  Is everything
>  2   that you said in there still true and correct?
>  3     A   I don't remember the whole entire
>  4   deposition, but as far as I know, yes.

Ex. 15, PowerComm Rule 30(b)(6) Depo., 11/11/14, at 6:22-7:4.

Additionally, Defendant originally asserted that Opt-In Plaintiffs Antonio Wall and Lavelle Gant were time barred and therefore did not produce discovery responses for them. However, on January 22, 2015, Defendants provided Plaintiffs 630 pages of discovery for these individuals, correcting their original position.  "Defendants were initially under the impression that these two individuals were time barred." Ex. 18, 1/22/15 Letter regarding Discovery.  This admission reveals that Defendants are still uncovering records that invalidate their position.

Plaintiffs have interrogatory responses with signed verification pages, confirming that 10 of the Plaintiffs in question worked for Defendants within the applicable statute of limitations and thus their claims are not time barred.  See Plaintiffs Interrogatory Responses, Exs. 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15.   Plaintiffs have also provided Defendants interrogatory responses with signed verification pages for the other 7 individuals in question.  Plaintiffs were unable to

retrieve evidence of the dates these Opt-In Plaintiffs worked.  However, it is the burden of the

Defendants to prove these individual worked outside the statute of limitations.  See *Anderson v.*

*Mt. Clemens Pottery Co.,* 328 U.S. 680, 687-88 (1946).

As Judge Grimm noted when denying Defendants' motions for summary judgment

previously filed in this matter:

> Defendants also object that Plaintiffs "rel[y] upon inadmissible hearsay and conclusory
> statements, unsupported by any evidence." Brown Reply Mem. 2; *see also* Randolph
> Reply Mem. 2. This too, simply is wrong. Randolph and Brown both have provided
> sworn declarations, pursuant to Fed. R. Civ. P. 56(c)(4). The sworn statements contained
> in Plaintiffs' declarations themselves are evidence that may be considered on summary
> judgment. *See* Fed. R. Civ. P. 56(c)(1)(A) (an issue of fact must be supported by "citing
> to particular parts of materials in the record, including ... affidavits or declarations");
> *Woollard v. Gallagher,* 712 F.3d 865, 877 & n.6 (4th Cir. 2013) (relying on declarations
> as evidence on summary judgment). To the extent that Defendants argue that Plaintiffs
> have failed to provide documentary evidence of their entitlement to overtime pay, that
> goes to the weight of the evidence at trial, not its sufficiency to prevent summary
> judgment.

Case 8:13-cv-01696-PWG Document 50 Filed 03/26/14 Pages 11-12 of 27 (emphasis added).

Further expanding on Judge Grimm's rationale for denying Defendants prior motions for

summary judgment, Fed. R. Civ. P. 56(c)(1)(A) provides that:

(c) Procedures.

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is
> genuinely disputed must support the assertion by:

>> (A) citing to particular parts of materials in the record, including
>> depositions, documents, electronically stored information, affidavits or
>> declarations, stipulations (including those made for purposes of the motion
>> only), admissions, *interrogatory answers*, or other materials;

Fed. R. Civ. P. 56(c)(1)(A)(emphasis added).

### XIII.   Plaintiffs have submitted interrogatory answers with signed verification pages for 61 Plaintiffs.

Defendants assert that Plaintiffs have not submitted interrogatory answers with signed verification pages for 8 individuals.  At the date of this filing, Plaintiffs have provided Defendants with three of the outstanding verification pages.[5]  Defendants argue that due to the absence of these verification pages, these Opt-In Plaintiffs should be dismissed from the case, citing to Federal Rules of Civil Procedure Rule 37.  However, Defendants have improperly interpreted the rule.  Federal Rules of Civil Procedure Rule 37 states, in relevant part, the following:

> (a) Motion for an Order Compelling Disclosure or Discovery.
>   (B) *To Compel a Discovery Response.* A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if:
>       (i) a deponent fails to answer a question asked under Rule 30 or 31;
>       (ii) a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a)(4);
>       (iii) a party fails to answer an interrogatory submitted under Rule 33; or
>       (iv) a party fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34.
> (b) Failure to Comply with a Court Order.
>   (2) *Sanctions Sought in the District Where the Action Is Pending.*
>     (A) *For Not Obeying a Discovery Order.* If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>       (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

---

[5] Plaintiffs' counsel has not been able to secure verification pages from the following individuals: Rodney Brooks, Terrence Dove, Jeffrey Jordan, Edward Robinson, and Anthony Wills.

> (ii) prohibiting the disobedient party from supporting or opposing designated
>    claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order
>    to submit to a physical or mental examination.

Fed. R. of Civ. P. 37.

Federal Rule of Civil Procedure Rule 37 provides a remedy of sanctions when a party has failed to comply with a court order.  Missing from Defendants' argument is Plaintiffs' failure to comply with a court order.  As such the Motion for Rule 37 sanctions is not proper.

### XIV.   Defendants incorrectly argue Plaintiffs Gorham and Jordan be dismissed from the case.

In their Motion for Summary Judgment, Defendants argue that Opt-In Plaintiffs Calvin Gorham and Jeffrey Jordan should be dismissed from the suit because their damages calculations were not included in the amended initial disclosures.  Defendants are arguing form over substance here.  The amended disclosures made by Plaintiffs can be corrected at anytime to include the damages calculations these individuals.  Moreover, Defendants possess the timesheets for both Gorham and Jordan, and therefore are aware of what their damages estimate would be.  As such, Defendants' motion to dismiss Opt-In Plaintiffs Gorham and Jordan should be denied.

### XV.   Opt-In Plaintiffs who opted in after the Court's deadline should not be dismissed.

Defendants argue that 4 Opt-In Plaintiffs, Cornelius Redfearn, Darnell Maddox, Ronald Young, and Calvin Gorham, should be dismissed from this suit because they opted in after the Court's 45 day deadline.  Def. Memo. at 17.  However, dismissing these individuals' claims

would be improper as their claims are not barred by the statute of limitations.[6]

If *arguendo*, the Court determines that these individuals should be separated from the instant action, the proper remedy would be to dismiss their claims and provide them a right to refile with effective dates of their original opt-in forms.  This would create duplicative litigation and would be against judicial economy.  Likewise, Defendants have never previously raised this issue with Plaintiffs and should be prohibited from doing so now as they are delayed in raising timeliness as a defense against these Opt-In Plaintiffs.

### XVI.   In the alternative, Plaintiffs move to exclude Geoffrey Bohn and Robert Battey as counsel.

If Plaintiffs Motion for Summary Judgment is not granted, Defendants' counsel, Geoffrey Bohn will be called as a witness at trial.  Maryland Rules of Professional Conduct 3.7 prohibits an attorney from being an advocate in a case where it is likely he will be called as a witness. [7] Maryland Professional Rule of Conduct Rule 3.7.  Mr. Bohn's testimony is central to Plaintiffs' case, as the quantum of damages available turns upon his testimony.  Mr. Bohn provided testimony on October 28, 2014, on the nature and dates of the legal advice he provided to Defendants.  Ex. 4, Bohn Depo. at 12:14-13:9, 16:18-18:13, 30:1-21.  Mr. Bohn also testified that Defendant's decision to classify Plaintiffs as independent contractors was for Defendants' personal financial benefit.  Ex. 4, Bohn Depo. at 30:1-21.

---

[6] Defendants stipulate that Opt-In Plaintiffs Redfearn, Maddox, Young, and Gorham are not barred by the statute of limitations.  *See* Def. Memo. at 16.

[7] Maryland Rules of Professional Conduct 3.7 provides that:
   (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
       (1) the testimony relates to an uncontested issue;
       (2) the testimony relates to the nature and value of legal services rendered in the case; or
       (3) disqualification of the lawyer would work substantial hardship on the client.
   (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Moreover, Mr. Bohn testified in his deposition that it is likely his partner, Robert Battey, reviewed documents and drafts for Defendants and thus is also a witness on the nature and dates of the legal advice he provided to Defendants.  Ex. 4, Bohn Depo. at 21:21-22:10.  Additionally, Mr. Bohn's law firm is comprised of three partners and one of counsel, Mr. Battey being one of the partners.  Ex. 4, Bohn Depo. at 6:19-7:16.  As such it is a proper objection when the trier of fact may be confused or misled by a lawyer (and the lawyer's partner) serving as both advocate and witness because this dual role may prejudice the litigation.  Comment 2 to Rule 3.7 ("The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.")  As such, Plaintiffs request that Mr. Bohn and Mr. Battey be disqualified as counsel in this matter in the event that Plaintiffs' motions for summary judgment on the issues of willfulness and lack of good faith are not granted.

## <u>CONCLUSION</u>

For the reasons set forth *supra*, the Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment on the issues of liability, Defendants' lack of good faith, and willfulness (with the determination of Plaintiffs' respective hours worked to be the sole issue to be tried to a jury).  In the alternative, Plaintiffs move to disqualify Geoffrey M. Bohn and Robert A. Battey as counsel of record for defendants, as in the event that this Court does not grant Plaintiffs' motion for summary judgment on the issues of Defendants' lack of good faith and/or willfulness, Plaintiffs will call Geoffrey M. Bohn and Robert A. Battey as witnesses in this matter to prove these issues.

## REQUEST FOR A HEARING

Plaintiffs request an oral hearing on all issues.

/s/ Nicholas Woodfield
R. Scott Oswald, D. Md. Bar No. 25391
Nicholas Woodfield, D. Md. Bar No. 15474
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 6, 2015, a true and correct copy of the foregoing

Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for

Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment has been

served via electronic filing upon the following:

Geoffrey M. Bohn, Bar #14872
Robert A. Battey, Bar #13210
BOHN & KOURETAS, PLC
P.O. Box 101685
Arlington, Virginia 22210
(703) 599-7076
(703) 842-8089 (facsimile)
bohn_kouretas_plc@yahoo.com
Attorney for Defendant

/s/ Nicholas Woodfield
Nicholas Woodfield, Esq.